El Pueblo de Puerto Rico, representado por el Hon. Gobernador de Puerto Rico, Luis Muñoz Marín, demandante y apelado, *v.* Aurea E. Franceschi de Fleming y su esposo William L. Fleming, John Doe y Richard Roe, demandados y apelantes.

Núm. 10172.—*Sometido:* Diciembre 7, 1950. *Resuelto:* Mayo 25, 1951.

*E. T. Fiddler, José G. González, Tomás I. Nido, Andrés Guille-mard, Julián O. McConnie, Jr., y Fernando Fornaris, Jr.,* abogados de los apelantes; *Hon. Procurador General Victor Gutiérrez Franqui (Vicente Géigel Polanco, Ex Procurador General,* en el alegato), *Alejandro Romanace, Procurador General Auxiliar, Carlos J. Faure* y *Gabriel Guerra,* abogados del apelado.

EL JUEZ ASOCIADO SEÑOR SNYDER emitió la opinión del tribunal.

En marzo 24, 1948 El Pueblo de Puerto Rico instó este pleito a nombre de la Autoridad de Fuentes Fluviales para expropiar los sistemas de distribución eléctrica de los municipios de Guayanilla y Yauco pertenecientes a los demandados. El Pueblo estimó que la compensación justa y razonable por dichos bienes era de $38,000 y depositó dicha suma. En su contestación los demandados alegaron que las propiedades expropiadas valían $200,000. Luego de un juicio en los méritos, el Tribunal de Expropiaciones dictó sentencia concediendo a los demandados la suma de $279.19 en adición a los $38,000 ya depositados. Los demandados apelaron de esta sentencia.

El primer señalamiento es que el tribunal inferior erró al resolver que el único método de valoración a ser usado

para los bienes aquí envueltos era el consignado en la sección 13 de la franquicia de acuerdo con la cual se construyeron y operaban los sistemas de distribución.

En 1920 la Comisión de Servicio Público otorgó la franquicia a Alejandro Franceschi, causante de los apelantes. La sección 13 dispone que las plantas y sistemas a ser construídos y usados de acuerdo con la misma podrían ser tomados o adquiridos por El Pueblo y dispuso además el método de valoración en caso de llevarse a efecto dicha adquisición. En 1924, antes de la terminación de los sistemas de distribución, la Comisión enmendó la franquicia. No efectuó cambio fundamental alguno en el primer párrafo de la sección 13 en tanto en cuanto a este caso concierne. Sin embargo, adicionó un segundo párrafo que disponía someter a arbitraje la valoración.(¹)

La cuestión a determinar es si por la radicación de la presente demanda de expropiación, El Pueblo estaba tratando de poner en vigor las disposiciones de la sección 13. Empe-

---

(¹) La sección 13, según·quedó enmendada en 1924, provee así:

"Que la planta y sistemas aquí autorizados, y todas sus pertenencias, y toda propiedad construída, adquirida o usada en los mismos, o cualquier parte de ella, pueden ser tomados, comprados o adquiridos por El Pueblo de Puerto Rico o por los Municipios de Guayanilla y Yauco, o cualquiera de éstos, en cualquier momento durante la vigencia de esta franquicia, por su justa y razonable valoración a la fecha de dicha adquisición. Dicha valoración no incluirá el valor de esta franquicia o cualquier valor adicional que dicha franquicia le haya dado a la referida planta o propiedad y no excederá el costo de tal planta y propiedad o cualquier porción de la misma usada y usable, menos deterioro.

"El Pueblo de Puerto Rico o los Municipios de Guayanilla y Yauco, o cualquiera de éstos, notificará con sesenta días de antelación al cesionario de su intención de ejercitar el derecho de adquirir las referidas propiedades arriba mencionado. La valoración justa y razonable será fijada por una junta de arbitraje, que será nombrada inmediatamente y que estará compuesta de un miembro designado por el cesionario, de un miembro seleccionado por el Gobernador a nombre del Pueblo de Puerto Rico o de los Municipios de Guayanilla y Yauco, o cualquiera de éstos, y de un tercer miembro designado por los dos primeros. La valoración fijada por una mayoría de esta junta será definitiva. Los gastos de tasación serán pagados de por mitad por el cesionario y por El Pueblo de Puerto Rico o por los Municipios de Guayanilla y Yauco, o por cualquiera de éstos. Nada de lo aquí consignado obligará al Pueblo de Puerto Rico o a los Municipios de Guayanilla

zaremos considerando dos cuestiones preliminares levantadas por los demandados. La primera es que el Tribunal de Expropiaciones carecía de "jurisdicción" para poner en vigor el contrato contenido en la sección 13. Alegan los demandados que dicho Tribunal es de jurisdicción limitada; que solamente puede conocer de aquellos casos donde el valor se establece de conformidad con la Ley general de Expropiación Forzosa;[2] y que si el valor iba a ser fijado de conformidad con la sección 13, El Pueblo vendría obligado a demandar no ante el Tribunal de Expropiaciones sino en las cortes de jurisdicción general en cumplimiento específico del contrato entre las partes.

Lo falaz de la teoría de los demandados es que nada encontramos en la Ley núm. 223, Leyes de Puerto Rico, 1948 ((1) pág. 775), que crea el Tribunal de Expropiaciones, que limite la jurisdicción de dicho Tribunal a aquellos casos en que se determina el valor a tenor con la norma fijada en la Ley de Expropiación Forzosa. Por el contrario, el artículo

---

y Yauco, o a cualquiera de éstos, a comprar la referida propiedad, pero si El Pueblo de Puerto Rico o los Municipios de Guayanilla y Yauco, o cualquiera de éstos, deciden comprarla, hará tal decisión mediante una ley de la Asamblea Legislativa de Puerto Rico o de. los Municipios de Guayanilla y Yauco, o cualquiera de éstos, debidamente aprobada de acuerdo con là ley. Si El Pueblo de Puerto Rico o los Municipios de Guayanilla y Yauco, o cualquiera de éstos, deciden comprarla, el cesionario retendrá la posesión de dicha propiedad, mantendrá la misma en buenas condiciones y operará la misma como ya se ha indicado, y tendrá derecho a recibir las ganancias provenientes de la misma hasta que el precio de compra, fijado como ya se ha dicho, haya sido pagado, ocurrido lo cual éste se desconectará de la planta eléctrica del cesionario. En cualquier momento después de transcurridos dos años de la fecha del ejercicio de su derecho a que la propiedad sea valorada, según antes se ha indicado, El Pueblo de Puerto Rico, o los Municipios de Guayanilla y Yauco, o cualquiera de éstos, pueden nuevamente ejercitar tal derecho, así como tener la correspondiente opción a comprar bajo las mismas condiciones antes provistas, y así sucesivamente." (Traducción nuestra.)

La sección 14 define al cesionario como que incluye a sus herederos y causahabientes.

[2] Véanse la Ley núm. 300, Leyes de Puerto Rico, 1946 ((1) pág. 775); Ley núm. 19, Leyes de Puerto Rico, Segunda y Tercera Sesiones Extraordinarias, 1942 (pág. 83); Ley núm. 479, Leyes de Puerto Rico, 1946 ((1) pág. 1403).

3 otorga al Tribunal de Expropiaciones jurisdicción exclusiva "en casos de expropiación forzosa de la propiedad para fines públicos." Esto quiere decir jurisdicción en todos los casos de expropiación, independientemente de qué norma se emplee para determinar el valor.

El hecho de que el valor no es la única cuestión envuelta en un procedimiento de expropiación robustece nuestra conclusión. Desde luego, usualmente es la cuestión más importante en un pleito de esta naturaleza. Pero el título y la posesión son también cuestiones que se dilucidan en el mismo. ([3]) Nada encontramos en la Ley núm. 223 que impida al Pueblo de Puerto Rico recurrir al pleito de expropiación ante el Tribunal de Expropiaciones para obtener un título rápido y válido a la propiedad aun cuando el valor de dicha propiedad vaya a ser determinado no bajo la regla general establecida en la Ley de Expropiación Forzosa, sino a tenor con un contrato existente entre El Pueblo y el dueño de los bienes expropiados. *Muschany* v. *United States*, 324 U. S. 49; *Danforth* v. *United States*, 308 U. S. 271; *United States* v. *Two Acres of Land, etc.*, 144 F.2d 207 (C.C.A. 7, 1944); *Judson* v. *United States*, 120 Fed. 637 (C.C.A. 2, 1903). Véanse *Autoridad de Hogares de P. R.* v. *Sagastivelza et al.*, ante, pág. 276; *Belaval* v. *Tribl. de Expropiaciones*, 71 D.P.R. 265.

Tampoco carece de jurisdicción el Tribunal de Expropiaciones porque la franquicia no solamente establece una fórmula para determinar el valor sino que también provee para una junta de arbitraje cuya decisión será definitiva. No vemos motivo alguno por el cual El Pueblo no pudo haber radicado un pleito de expropiación ante el Tribunal de Ex-

---

([3]) En los casos en que se radica una Declaración de Adquisición, ésta más bien que la orden de la corte, confiere el título al Pueblo. *Pueblo* v. *Registrador*, 70 D.P.R. 260; *P. R. Tel. Co.* v. *P. R. Communications Auth. et al.*, 189 F.2d 39, (C.A. 1, mayo 8, 1951). Pero El Pueblo obtiene el título en virtud del procedimiento de expropiación. En verdad, en muchos casos, aun cuando las partes han convenido el precio, se radica un procedimiento amigable de expropiación, con el fin de darle al Pueblo posesión inmediata y un título limpio.

propiaciones, con el fin de obtener inmediatamente título a los bienes aquí envueltos, y al mismo tiempo haber solicitado el arbitraje en cuanto al valor. Bajo dichas circunstancias, el Tribunal de Expropiaciones hubiera estado llamado, en cuanto a la cuestión de valoración, a hacer valer la disposición de arbitraje contenida en la franquicia en la misma forma en que las cortes regulares hacen valer los laudos de arbitraje. Véanse *Junta Relaciones del Trabajo* v. *N.Y. & P.R. S/S Co.,* 69 D.P.R. 782; *Judson* v. *United States,* supra.

La segunda contención preliminar de los demandados es que la sección 13 de la franquicia no incluía la expropiación como uno de los métodos de adquisición; que como consecuencia cuando el gobierno radicó este pleito de expropiación, eligió no reclamar sus derechos bajo la sección 13; y que la corte inferior por consiguiente debió haber determinado el valor bajo la norma establecida en la Ley de Expropiación y no bajo la sección 13.

No estamos conformes con los apelantes sobre este punto porque no podemos aceptar su premisa de que la sección 13 no incluye la expropiación como uno de los métodos de adquisición. Creemos que tal como se emplea en el primer párrafo de la sección 13 la frase "pueden ser tomados, comprados o adquiridos" es suficientemente amplia para incluir la toma por expropiación. Admitimos que el asunto hubiera sido más claro si la sección 13 hubiera provisto que el gobierno puede "expropiarlos, comprarlos o adquirirlos". Pero "tomarlos" es una palabra genérica; la propiedad puede ser tomada por un número de métodos, incluyendo la expropiación. En verdad, el mismo documento que usualmente confiere el título al gobierno en un caso de expropiación es llamado en inglés el "Declaration of Taking". Nada encontramos en el primer párrafo de la sección 13 que impida al gobierno ejercitar sus derechos bajo la misma mediante un recurso de expropiación.

Es cierto que, al adicionar el segundo párrafo en la enmienda de 1924 a la franquicia, la Comisión de Servicio Público solamente empleó las palabras "adquirir" y "comprar"

al disponer la valoración por una junta de arbitraje. Sin embargo, al adicionar este párrafo, la Comisión no cambió la fraseología del primer párrafo al efecto de que los sistemas "pueden ser tomados, comprados o adquiridos" por El Pueblo. En consecuencia no fué su intención eliminar la expropiación como uno de los métodos de adquisición originalmente incluídos en la franquicia de 1920. Resolvemos que, interpretando los párrafos 1 y 2 conjuntamente, la franquicia no impide la expropiación como uno de los métodos para adquirir estos bienes a tenor con la sección 13.

■■ Sin embargo, convenimos con los demandados en el punto fundamental de que El Pueblo eligió no ejercitar sus derechos bajo la franquicia. Los términos de ésta constituyeron un contrato entre El Pueblo de una parte y el cesionario y sus causahabientes de la otra. *N.Y. Electric Lines* v. *Empire City Subway*, 235 U. S. 179; *White Star Bus Line* v. *People of Puerto Rico*, 75 F.2d 889 (C.C.A. 1, 1935); *En el Asunto, Etc. de Herminia Colón Vda. de Semidey*, 59 D.P.R. 248; *Larson* v. *South Dakota*, 278 U. S. 429; *Arkansas-Missouri Power Co.* v. *Brown*, 4 S.W.2d 15 (Ark., 1928). Si El Pueblo hubiera elegido tomar los sistemas de distribución bajo la sección 13 de la franquicia, todas las disposiciones de la sección 13—el contrato entre las partes—serían de aplicación, y no meramente la disposición en cuanto a la valoración. Estas otras disposiciones son (1) notificación con 60 días de antelación de que se intenta adquirir las propiedades; (2) arbitraje ante una junta de valoración, cuyo laudo será definitivo; (3) el derecho del cesionario a retener la posesión de los bienes hasta que la junta fije el precio y éste haya sido pagado.

El Pueblo pudo haber expropiado bajo la regla general de valoración justa y razonable. O pudo hacerlo bajo la franquicia fijando ésta la norma de compensación. Pero para proceder bajo esta última venía obligado a cumplir con las tres condiciones antes reseñadas. Dejamos a un lado la cuestión de la notificación de 60 días. Pero no hay controversia

alguna en cuanto a que El Pueblo no hizo gestión para la selección de árbitros. Y solicitaron en la demanda la posesión en una fecha fijada por la corte y la obtuvieron el 1ro. de abril de 1948, una semana después de haber radicado el recurso. Por consiguiente, parece claro que en cuanto a la cuestión de valoración tuvieron la intención de proceder no bajo el contrato sino bajo la ley general de expropiación. Resolver lo contrario sería permitir a El Pueblo elegir el hacer valer una parte de un contrato y hacer caso omiso de las otras disposiciones del mismo. *Cf. Mercedes Bus Line* v. *Rojas*, 70 D.P.R. 540, 544–45. (⁴)

Visto lo anterior, la corte inferior cometió error al emplear la fórmula hallada en la sección 13 como la norma exclusiva de valoración. Pero todavía resta el problema en cuanto al efecto de la franquicia sobre el valor en el mercado de los bienes expropiados.

Ambas partes convienen que de no estar la sección 13 en la franquicia, la mejor evidencia del valor justo y razonable de una empresa de servicio público, en ausencia de ventas contemporáneas de propiedad similar, sería el costo de reproducción menos depreciación. *Appleton Waterworks Co.* v. *Railroad Commission*, 142 N.W. 476 (Wisc., 1913); *Kennebec Water Dist.* v. *City of Waterville*, 54 Atl. (Me., 1902); *Annotation*, 47 L.R.A. (N.S.) 770; Orgel, *Valuation Under*

---

(⁴) De la demanda no surge nada contrario a la posición que hemos asumido. Es cierto que, luego de interponer las alegaciones corrientes halladas en el procedimiento ordinario de expropiación, la demanda alega la existencia de la franquicia y sintetiza las disposiciones de la sección 13. Pero no dice que El Pueblo toma la propiedad bajo la sección 13. Tampoco solicita el nombramiento de los árbitros. Por tanto interpretamos la inclusión de las disposiciones de la sección 13 en la demanda como un esfuerzo del Pueblo para demostrar que el precio en el mercado que un comprador voluntario pagaría por los sistemas se afectó por los términos de la franquicia. Así interpretada, la demanda está de acuerdo con la posición más adelante asumida por nosotros sobre la cuestión del valor de la propiedad expropiada.

Además, a través del juicio El Pueblo no hizo esfuerzo alguno para obtener el nombramiento de la junta de arbitraje o aplazar la posesión de la propiedad hasta que la junta hubiera emitido su fallo en cuanto al valor y éste hubiera sido totalmente pagado.

*Eminent Domain*, pág. 642 *et seq.* Cf. *United States* v. *Brooklyn Union Gas Co.*, 168 F.2d 391 (C.C.A. 2, 1948).

■■ En igual forma, de no existir la sección 13, para determinar la compensación justa y razonable en este caso tendríamos que tomar en consideración el valor de negocio en marcha (*going concern value*) de los sistemas. Esto es "la diferencia entre el valor de una planta establecida con su capacidad adquisitiva ya desarrollada, y el valor de una planta idéntica completamente nueva que todavía tiene que desarrollar su negocio." II Bonbright, *Valuation of Property*, págs. 1146–51, y autoridades citadas; *Kimball Laundry Co.* v. *United States*, 338 U. S. 1, 12; Nota, 48 L.R.A. (N.S.) 1092; *Omaha* v. *Omaha Water Co.*, 218 U. S. 180, 202–03; *National Waterworks Co.* v. *Kansas City*, 62 Fed. 853 (C.C.A. 8, 1894); *Des Moines Gas Co.* v. *Des Moines*, 238 U. S. 153, 164–65; Orgel, supra, pág. 680 *et seq;* 34 Col.L.Rev. 534, 543, 545–47. En el caso de *Omaha* la Corte Suprema aparentemente resolvió que el valor de negocio en marcha es un elemento separado de valor en adición al valor total de la propiedad tangible. Más recientemente, la Corte Suprema ha insinuado que el valor de negocio en marcha se refleja en la valoración razonable de la propiedad tangible. *Power Comm'n* v. *Hope Gas Co.*, 320 U. S. 591, 609; Bruton, *How To Value Dealer—Distributor Franchises*, 29 Taxes 109, 114 (Feb., 1951). En análisis final, ya se le caracterice como un "elemento separado" de valor o se le considere como que aumenta el valor de la propiedad tangible, el valor de negocio en marcha es admisible en evidencia al determinar la compensación justa y razonable al expropiarse un sistema de servicio público.(⁵)

Por los motivos que más adelante indicaremos, es innecesario examinar en detalle la forma de probar el valor de

---

(⁵) Algunos de los casos anteriores son casos de tarifas y no de expropiación. Los casos de tarifas, al tratar de determinar la valoración de las propiedades como una base tarifaria, tienen sus raíces en los casos de expropiación. II Bonbright, supra, pág. 1094 *et seq.* Reconocemos los muchos defectos que hay al buscar analogía entre los casos de tarifas y

negocio en marcha. Admitimos que es intangible y no puede determinarse con precisión. Pero no podemos convenir, por lo menos en casos de expropiación de sistemas de servicio público, que el "valor de negocio en marcha está llamado a desaparecer." ([6])

Aun cuando la sección 13 no estuviera en la franquicia, los demandados no tendrían derecho a que se tomara en consideración el alegado valor de la franquicia y la plusvalía (*good will*). Cuando como ocurre aquí una franquicia, como cuestión de derecho, es revocable a voluntad del gobierno, *Commission* v. *Havemeyer*, 296 U. S. 506, aquélla no se incluye en la valoración de los bienes de una empresa de servicio público. *Georgia Ry.* v. *R. R. Comm.*, 262 U. S. 625, 632; II Bonbright, supra, págs. 1143–45; Bruton, supra, pág. 116. Y se aplica la misma regla con respecto a la plusvalía de una empresa de servicio público expropiada. *Willcox* v. *Consolidated Gas Co.*, 212 U. S. 19; *Des Moines Gas Co.* v. *Des Moines*, supra; II Bonbright, supra, pág. 1146; Bruton, supra, pág. 110 *et seq.* Los demandados admiten esto y no hacen reclamación alguna en relación al valor de su franquicia o de la plusvalía.

Así vemos que a no ser por la sección 13 de la franquicia los demandados tendrían derecho al costo de reproducción menos la depreciación, con el valor de negocio en marcha como un elemento de valor. ([7]) Pero el costo de re-

---

los de expropiación. I Bonbright, supra, pág. 3; II, id., pág. 1096; *Cía. Azucarera Toa* v. *Com. Serv. Público* 71 D.P.R. 212, 216, y autoridades citadas en la nota 2. Sin embargo, creemos que impera el mismo principio en ambas clases de casos sobre la cuestión específica del valor de negocio en marcha.

([6]) II Bonbright, supra, pág. 1150, indica que muchos escritores han expresado "la opinión de que el valor de negocio en marcha está llamado a desaparecer. E indudablemente esta conclusión se robustece si la Corte Suprema continúa insistiendo en que su importe debe 'probarse' definidamente mientras se niega a darle cualquier significado que haga que su prueba sea posible aun teóricamente. Uno podría muy bien exigir prueba del número de camellos que cabrían por el ojo de un aguja."

([7]) Cuando más adelante usamos la frase "costo de reproducción", debe entenderse que incluye los conceptos de que la depreciación es deducida y el valor de negocio en marcha es añadido.

producción se usa en el caso corriente de empresas de servicio público solamente porque es la mejor evidencia obtenible sobre la cuestión de valor en el mercado. El factor decisivo como en otros casos es el valor en el mercado; v.g., lo que un comprador voluntario pagaría a un vendedor voluntario. *Autoridad Sobre Hogares de P. R.* v. *Valldejuli*, 71 D.P.R. 640, y casos citados; I Bonbright, supra, págs. 432, 447. Además, al determinar el valor en el mercado la norma es "qué ha perdido el dueño y no qué ha ganado el expropiador." *Boston Chamber of Commerce* v. *Boston*, 217 U. S. 189, 195.

Al tratar de establecer el valor en el mercado en este caso, no podemos emplear, como en el caso corriente de expropiación de una empresa de servicio público, el costo de reproducción como la mejor evidencia del valor en el mercado. En este caso, antes de la expropiación por el gobierno, un comprador voluntario no hubiera pagado a los demandados el costo de reproducción. Por el contrario, su decisión en cuanto al precio de venta hubiera sido grandemente influída por la posibilidad de que en cualquier momento después de haber él comprado las propiedades, el gobierno las tomara bajo la sección 13, no al valor en el mercado, sino al costo original menos deterioro.([8]) Bajo estas circunstancias, los demandados tenían derecho a presentar evidencia en cuanto al costo de reproducción con el fin primeramente de establecer el valor en el mercado de los sistemas independientemente de la sección 13.([9]) Pero si esta cifra fuese sustancialmente mayor que el costo original menos deterioro, el verdadero valor en el mercado necesariamente sería menos que el costo de reproducción debido al riesgo sustancial de que el gobierno en seguida recapturara los sistemas al comprador al costo ori-

---

([8]) Decidimos más adelante que la sección 13 provee la adquisición al costo original menos el deterioro.

([9]) Los autos contienen considerable evidencia en cuanto al costo de reproducción sometida por ambas partes, porque la corte inferior oyó prueba sobre esta cuestión durante unos días antes de que decidiera que el costo original era la única medida de compensación.

ginal menos deterioro.   Véase *Monongahela Navigat'n. Co.
v. United States*, 148 U. S. 312, 344. ([10])

Si ésta fuera una empresa lucrativa, un comprador voluntario bajo las anteriores circunstancias pagaría más que el costo original menos deterioro.   Cuánto más pagaría depende del estimado que una persona razonable haría sobre si el gobierno recapturaría los sistemas y cuándo lo haría más o menos.   Reconocemos las dificultades que se presentan al aplicar esta norma.   Pero no vemos cómo podemos evitarlo.   A lo mejor se impone una conjetura producto de información sobre las circunstancias concurrentes, incluyendo los sucesos legislativos y administrativos que reflejan la política del gobierno insular para adquirir éste y los otros sistemas de distribución eléctrica en Puerto Rico.   Véase, entre otras, la Ley núm. 189, Leyes de Puerto Rico, 1946.   Si bien ésta será inevitablemente una cifra general más bien que una suma específica que se puede determinar con certeza matemática, no obstante los demandados tienen derecho a recobrarla.

El segundo señalamiento se refiere a la interpretación del primer párrafo de la sección 13 de la franquicia. Los demandados sostienen que la corte inferior cometió error al concluir que la fórmula para valor establecida en la sección 13 era el costo original menos deterioro.   Aun cuando esta fórmula no es la norma exclusiva de valor, como ya hemos visto, desempeña un importante papel en este caso.   Por tanto es necesario determinar su significado y alcance.

Los demandados hacen gran hincapié en la disposición de la primera oración de la sección 13 al efecto de que El Pueblo puede adquirir estas propiedades "por justa y razonable va-

---

([10]) En dicho caso la corte dijo en una situación parecida que (pág. 344) ". . . indudablemente la existencia de este derecho reservado para tomar la propiedad a base de ciertos términos específicos puede con frecuencia, y quizás en el presente caso, materialmente afectar la cuestión del valor."   Al mismo efecto, Orgel, supra, pág. 672, dice que "el comprador potencial tomará nota de la probable compensación en compra o expropiación."

loración a la fecha de dicha adquisición". Arguyen que esto necesariamente quiere decir el costo de reproducción en ausencia de ventas recientes de propiedad similar. Consistente con este aserto, los demandados interpretan "el costo de tal planta" en la segunda oración como el costo de reproducción.

No estamos conformes. Cuando ambas oraciones son leídas conjuntamente, creemos que es obvio lo que la Comisión tuvo en mente. Vislumbró la posibilidad de que El Pueblo pudiera adquirir los sistemas en un mercado en decadencia, como el que prevaleció durante algunos años a partir del 1929. Por consiguiente proveyó la adquisición de las propiedades "por su justa y razonable valoración a la fecha de dicha adquisición" con el fin de cerciorarse de que El Pueblo pagaría solamente dicha suma si a la fecha de adquisición el valor en el mercado o el costo de reproducción era menor que el costo original o verdadero debido a la depresión o a cualquier otra causa. Pero para evitar la posibilidad de que El Pueblo tendría que pagar más del costo verdadero si adquiría los bienes durante un período de inflación, la franquicia disponía que la valoración "no excederá el costo de tal planta y propiedad. . . menos deterioro."

Convenir con los demandados en cuanto al significado de la sección 13 equivaldría a resolver que dicha sección era superflua. El Pueblo podía expropiar las propiedades al costo de reproducción sin la sección 13. La Comisión debe haber incluído dicha sección en la franquicia para algún otro propósito ajeno al de reexponer la regla general aplicable a los casos de expropiación. El único propósito que podemos inferir de ello es la interpretación ya expuesta.

Aparte de lo antes dicho, creemos que el lenguaje claramente significa costo original. La palabra costo, cuando se emplea en la acepción corriente, normalmente significa lo que algo ha costado de hecho, no lo que costaría en alguna fecha futura si se deseare reproducirlo. Y como se dice en I Bonbright, supra, pág. 140, el costo original es el único costo verdadero; el costo de reproducción siempre es hipotético. Ade-

más, convenir con los demandados sería en efecto decir que El Pueblo debe pagar el costo *más* apreciación. Pero la sección 13 exige el pago de costo *menos* deterioro.

Los demandados levantan la cuestión de que nos confrontamos con dos costos originales: (1) los costos verdaderos del cesionario original, y (2) el costo a los demandados, quienes adquirieron los sistemas por herencia en 1933.([11]) Pero el costo no significa lo que algún comprador intermediario pagó por los sistemas. Más bien significa las sumas que de hecho fueron desembolsadas en la construcción, ya sea por el cesionario o por su causahabiente. Esto, desde luego, incluiría cualesquiera sumas desembolsadas para mejoras o ampliaciones, si bien no para meras sustituciones.

El tercer señalamiento es que la corte inferior cometió error al adoptar el Informe Z, *Exhibit* 8 del demandante, como base para fijar la compensación. En sus conclusiones de hecho, luego de indicar que anteriormente había resuelto que la única medida de valor era el costo original menos el deterioro, según lo dispone la sección 13 de la franquicia, la corte inferior manifestó que dictaría sentencia a base del Exhibit 8, que caracterizó como "un estimado del costo original de las propiedades de los demandados basado en el costo de materiales y de mano de obra en el 1945." Decidió, siguiendo las cifras contenidas en el Exhibit 8, que la planta costó $62,320.35. De dicha suma dedujo no el deterioro sino la depreciación diciendo que la misma "debe ser, a la luz de toda la prueba presentada en este caso, el 45 por ciento y no el 48 y pico por ciento que estima el demandante." También dijo que había tomado en consideración que los demandados habían pagado arbitrios sobre algunos de los materiales y equipo. Entonces concedió a los demandados $279.19 en adición al depósito de $38,000.

La sección 6 de la franquicia disponía lo siguiente:

([11]) Los demandados ofrecieron prueba de que uno de los demandados, la señora Franceschi de Fleming, tomó estos sistemas en 1933 con un valor de $60,000 en pago de sus derechos hereditarios en la herencia de su madre.

"Que el cesionario llevará tales libros que en cualquier momento reflejen totalmente la verdadera condición económica de la planta eléctrica y los sistemas aquí autorizados y los resultados obtenidos de su operación. Todos los gastos incurridos por el cesionario en relación con la construcción, instalación, mantenimiento y operación de dicha planta y sistemas eléctricos, incluyendo costos unitarios de material y labor, así como todo ingreso derivado de la venta de energía eléctrica, o de alguna otra fuente, en relación con dicha planta y sistemas, se harán constar en cuentas correspondientes.

"Un informe conteniendo estadísticas detalladas de funcionamiento y un balance minucioso de ganancias y pérdidas de la planta y los sistemas, para cada año fiscal, será preparado por el cesionario dentro de los dos meses siguientes a la terminación de cada año fiscal, y se radicará a la mayor brevedad posible ante la Comisión de Servicio Público." (Traducción nuestra.)

No obstante esta disposición mandatoria, los demandados no llevaron libros demostrativos del importe y fechas de sus compras y de la instalación de materiales y equipo. Esta infracción de la franquicia fué aún más flagrante en vista de la posibilidad de que El Pueblo pudiera recapturar los sistemas al costo bajo la sección 13. Ciertamente no podemos rechazar la fórmula de costo original meramente porque los demandados no cumplieron con su deber de llevar libros. Ellos son los únicos a culpar porque el caso debe decidirse a base de estimados más bien que a base de cifras genuinas de costos verdaderos.

A la luz de estas circunstancias, la posición de los demandados es insostenible. Éstos no presentaron evidencia alguna en cuanto al costo original porque no existían records del mismo. Pero bajo estas condiciones fué su deber someter el mejor estimado que pudieran preparar sobre el costo original. Ésta era tarea difícil pero no imposible. Mediante observación al momento de la expropiación—o quizá aun todavía—los peritos podrían estimar las fechas probables de instalación del equipo, siempre y cuando que las operaciones fueran normales. Y los precios, incluyendo los arbitrios, para los compradores pequeños a las fechas de instalación,

podrían ser obtenidos de los vendedores o fabricantes. Los costos de instalación a las fechas envueltas deben estar disponibles para ambas partes, ya que ambas han estado en este negocio durante muchos años. Nos damos cuenta de que todo esto conllevará considerable esfuerzo. Pero los demandados no pueden quejarse de una situación creada por ellos mismos por no llevar libros según se lo exigía la sección 6 de la franquicia, para hacer frente precisamente a esta contingencia. ([12])

■ Por otro lado, es aparente de lo que hemos dicho que la corte inferior cometió error al basar su sentencia únicamente en el Exhibit 8 del Pueblo. Ése no fué un estimado correcto del costo original de la propiedad expropiada por tres motivos: (1) el costo significa costo a la fecha de adquisición, no al 1945; ([13]) (2) el costo a la Autoridad de Fuentes Fluviales, que frecuentemente compraba en grandes cantidades, pudiera ser menor que el costo a los demandados, quienes compraban en pequeños lotes; (3) la Autoridad no pagaba arbitrios cuando las compras eran consignadas directamente a ella; mientras que los demandados siempre pagaban arbitrios como parte de sus costos. ([14])

Reconocemos el dilema de la corte inferior. La negativa de los demandados a someter evidencia sobre el costo original la obligaba a decidir el caso como mejor podía a base de la

---

([12]) Notamos de paso que la sección 11 de la franquicia dispone que la Comisión tendrá el derecho de revocar la franquicia y que tal revocación no impondrá obligación al Pueblo por daños. Más importante aún, la sección 11 también dispone que si el cesionario deja de cumplir con *cualquiera* de las disposiciones de la franquicia, los derechos concedidos por la misma quedarán *ipso facto* sin efecto y serán nulos, e ineficaces.

([13]) No está enteramente claro si los precios usados en el Exhibit 8 eran de 1933 al 1941 o para el 1945. De cualquier modo, el uso de uno u otro período era improcedente.

([14]) Como antes se ha indicado, la corte inferior hizo una manifestación general en sus conclusiones de hecho al efecto de que había considerado que los demandados pagaron los arbitrios sobre algunos de los materiales y equipos. Sin embargo, el caso exige conclusiones más precisas sobre estos arbitrios, que probablemente fueron generalmente incluídos como parte de los precios de compra pagados por los demandados. Véase *P. R. Telephone Co.* v. *Tribl. Contribuciones*, 68 D.P.R. 154, 165.

evidencia sometida por El Pueblo sobre esta cuestión. Sin embargo, toda vez que procede un nuevo juicio con motivo de la errónea decisión de que el costo original es la única medida de compensación, creemos conveniente indicar los defectos que hay en el Exhibit 8. Ambas partes deben ser requeridas para que reconstruyan como mejor puedan las cifras de costo a las fechas de instalación.

La corte inferior también debe reexaminar su decisión para conceder 45 por ciento de depreciación. La prueba del Pueblo fué que la depreciación ascendía aproximadamente a 48 por ciento; la de los demandados que ascendía a 30 por ciento. Pero ambas cifras fueron aparentemente sometidas sobre la teoría convencional del costo de reproducción menos depreciación. Y la depreciación bajo dichas circunstancias de ordinario incluye obsolescencia así como deterioro físico. Orgel, supra, pág. 649 *et seq.* ([15]) Sin embargo, la sección 13 no contiene disposición alguna para deducciones por obsolescencia. Sólo provee deducciones por deterioro. Y en este contexto interpretamos la palabra deterioro como que quiere decir deterioro físico. Al calcular el costo menos deterioro bajo la sección 13, la corte inferior debe por consiguiente limitar las deducciones del costo original al deterioro físico.

█ El cuarto señalamiento es que la corte inferior cometió error al negarse a conceder compensación por el valor de negocio en marcha de la propiedad expropiada. Ya hemos visto que, a no ser por la sección 13 de la franquicia, prueba sobre el valor de negocio en marcha sería relevante sobre la cuestión de compensación justa y razonable. Pero hemos resuelto que la medida de compensación en este caso es la cantidad fijada por la fórmula hallada en la sección 13 más cualquier suma adicional que un comprador voluntario habría pagado en 1948 antes de la expropiación. En consecuencia el

---

([15]) La prueba no es enteramente clara con respecto a si la obsolescencia jugó algún papel en las cifras de depreciación sometidas por los peritos. Esto debe ser aclarado en el nuevo juicio.

punto se reduce a determinar si el valor de negocio en marcha es un elemento de la fórmula comprendida en la sección 13.

En *Omaha* v. *Omaha Water Co.*, supra, una empresa de servicio público fué comprada por un municipio bajo una ordenanza que disponía que si la propiedad era adquirida en esa forma, nada sería pagado por la franquicia. La Corte Suprema resolvió que esta disposición no impedía la inclusión del valor de negocio en marcha como un elemento de valor. El Pueblo trata de distinguir este caso por el fundamento de que la sección 13 no solamente dispone que la "valoración no incluirá el valor de esta franquicia", si que también provee que no se incluirá "cualquier valor adicional que dicha franquicia le haya dado a la referida planta. . . ." El Pueblo arguye que aquí el valor de negocio en marcha cae bajo el valor adicional que emana de la franquicia por el cual no puede concederse compensación alguna. No estamos conformes. La franquicia meramente autoriza la operación; el valor de negocio en marcha procede de operaciones de hecho. Por consiguiente este valor de negocio en marcha no es un valor adicional que la franquicia le dió a los sistemas.

Sin embargo, concluímos por un motivo diferente que el valor de negocio en marcha no puede ser incluído bajo la sección 13. Ésta dispone que la valoración bajo la misma "no excederá" el costo menos deterioro. En consecuencia, aun cuando el valor de negocio en marcha es un concepto separado y aparte del valor de la franquicia, no puede ser adicionado al costo al determinar la valoración bajo la sección 13. Así hacerlo infringiría la inhibición de la sección 13 contra pagar más del costo.

El quinto señalamiento es que la corte inferior erró al apreciar la evidencia. No es necesario que examinemos este error ya que el caso tendrá que verse de nuevo de conformidad con los puntos de vista antes expuestos. Sintetizándolos, no creemos que la corte inferior cometió error al admitir evidencia del costo de reproducción, incluyendo el valor de negocio en marcha, menos depreciación. Estas ci-

fras demostrarían el valor en el mercado de los sistemas independientemente de la sección 13 de la franquicia. Pero aquí dicha valoración sería útil solamente como un factor relevante para determinar lo que un comprador voluntario pagaría a la luz de la sección 13. Tal comprador pagaría solamente el costo original menos el deterioro físico (excluyendo el valor de negocio en marcha) más una suma adicional calculada a base del período por el cual probablemente estaría en posesión de la propiedad.

*La sentencia del Tribunal de Expropiaciones será revocada y se devolverá el caso para un nuevo juicio.*

El Juez Presidente Sr. De Jesús no intervino.

El Juez Asociado Sr. Negrón Fernández se inhibió.