EL PUEBLO DE PUERTO RICO, representado por el Comisionado de lo Interior de P. R., JORGE J. JIMÉNEZ, demandante, apelante y apelado, *v.* LA SOCIEDAD MCCORMICK, ALCAIDE & CO., S. EN C., ETC., demandados, apelados y apelante la

Sociedad en cuestión; FLOOR COVERINGS COMPANY OF PUERTO RICO, interventora, apelada y apelante.

Número 10633.

*Sometido:* 1 de marzo de 1955. *Resuelto:* 29 de febrero de 1956.

942

*Hon. Secretario de Justicia Interino J. B. Fernández Badillo* y *Clemente Pérez Martínez,* abogados de El Pueblo, apelante-apelado; *Luis Blanco Lugo* y *Carlos J. Torres,* abogados de los apelados-apelantes Sociedad McCormick, Alcaide & Co., S. en C., y esposos Torres–Alcaide; *Martín Travieso,* abogado de la interventora, apelada-apelante.

EL JUEZ PRESIDENTE SEÑOR SNYDER ·emitió la opinión del Tribunal.

El 19 de abril de 1950 El Pueblo de Puerto Rico radicó acción ante el anterior Tribunal de Expropiaciones expropiando el título de dominio sobre una parcela de terreno y una edificación enclavada en la misma que pertenecían a Carlos J. Torres y a su esposa, a quienes en lo sucesivo llamaremos Torres. Para dicha fecha la propiedad estaba ocupada por la Floor Coverings Company of Puerto Rico, Inc., a quien en adelante llamaremos la Floor Coverings, de conformidad con un contrato de arrendamiento por cinco años otorgado en 1946.([1]) El arrendamiento no se inscribió en el registro

---

[1] Torres había dado la propiedad en arrendamiento a McCormick, Alcaide & Co., S. en C., una sociedad propiedad de y controlada por Torres. La sociedad a su vez la había subarrendado a la Floor Coverings. Sin embargo, en vista de la identidad de intereses entre Torres y la sociedad, seguiremos la pauta trazada por las partes y el tribunal sentenciador al caracterizar a Torres como el arrendador y a la Floor Coverings como la arrendataria, a los fines de este caso.

de la propiedad y la Floor Coverings no fué hecha parte demandada en la acción.

El 7 de agosto de 1950 Torres radicó una moción para que se le entregaran las sumas depositadas por El Pueblo —$1,528.52 y $17,747.50—como compensación por el terreno y el edificio, respectivamente. El Pueblo no se opuso a dicha moción. Ésta fué declarada con lugar y se le entregaron los fondos a Torres el 9 de agosto de 1950.

El 15 de agosto de 1950, luego de obtener permiso del tribunal sentenciador para intervenir, la Floor Coverings radicó una contestación solicitando entre otras cosas el valor en el mercado de su contrato de arrendamiento y daños por la remoción de su maquinaria. Torres, después de haber sido notificado de una contestación enmendada radicada por la Floor Coverings el 25 de agosto de 1950, radicó una moción el 7 de septiembre de 1950 conviniendo en que las sumas depositadas por El Pueblo y retiradas por Torres constituían el valor en el mercado del terreno y edificio expropiados y consintiendo en que se dictara sentencia a ese efecto.

Se concedió permiso a la Floor Coverings para que radicara una segunda contestación enmendada el 17 de enero de 1951. También se permitió a Torres radicar una contestación enmendada el 26 del mismo mes, manifestando que aceptaba que las sumas retiradas por él constituían el valor justo en el mercado de la parcela y del edificio, pero solicitaba del tribunal que resolviese que estas sumas pertenecían exclusivamente a él y no incluían daños a los cuales la Floor Coverings, como arrendataria, pudiera tener derecho. (²)

(²) El 31 de enero de 1951, pocos días después de comenzado el juicio, Torres solicitó permiso para radicar una segunda contestación enmendada. La moción decía que él había consentido en una sentencia fijando las sumas depositadas como el valor en el mercado de los bienes expropiados bajo la impresión de que estas cantidades no incluían cualesquiera daños debidos a la Floor Coverings. La proyectada segunda contestación enmendada alegaba que "el valor total" de los bienes era de $29,680.75 y solicitaba que se ordenase al Pueblo que depositara la suma adicional de $10,405, que era exactamente la suma reclamada por la Floor Coverings en su segunda contestación enmendada. El tribunal sentenciador nunca concedió permiso a Torres para radicar esta propuesta segunda contestación enmen-

Celebrado el juicio en los méritos, el tribunal sentenciador dictó sentencia a favor de la Floor Coverings y en contra del Pueblo por $4,000 como compensación por la pérdida del arrendamiento. Tanto El Pueblo como Torres y la Floor Coverings han apelado de esta sentencia.

## I

En su apelación El Pueblo alega que Torres y no él es el responsable de cualesquiera daños a los cuales la Floor Coverings pudiera tener derecho por la pérdida de su arrendamiento. Brevemente expuesta, la teoría del Pueblo es como sigue: El Pueblo expropió el título de dominio sobre los bienes y no los diversos intereses de demandados específicos. Tanto en sus alegaciones como durante el juicio Torres admitió que el depósito constituía el valor de los bienes en el mercado. Como Torres retiró todo el depósito, la compensación de la Floor Coverings, de existir alguna, por la pérdida de su contrato de arrendamiento debe ser pagada por Torres del depósito que él retiró.

Aparentemente el tribunal sentenciador fué de opinión que no solamente Torres tenía derecho a todo el valor del título de dominio sino que la Floor Coverings también tenía derecho a una suma adicional por el valor de su arrendamiento. No estamos de acuerdo. "Un recurso de expropiación es un procedimiento *in rem*. No va dirigido contra ningún demandado en particular, sino contra la propiedad propiamente dicha. Si bien el ejercicio del poder de expropiar extingue todos los derechos anteriores sobre la propiedad, el gobierno no expropia el interés que pueda tener ningún demandado en particular sobre la propiedad." *Pueblo* v. *632 Metros Cuadrados de Terreno*, 74 D.P.R. 961, 970. La com-

---

dada. Y durante el juicio Torres abandonó la teoría expuesta en ella al efecto de que cualquier suma que se le debiera a la Floor Coverings tenía que ser pagada por el Pueblo. Por el contrario, si bien Torres sostenía que la Floor Coverings no había sufrido daño alguno, repetidamente admitió durante el juicio que en caso de tener que pagársele alguna cantidad a la Floor Coverings, la misma debía proceder del depósito retirado por él.

pensación fijada por el tribunal sustituye los bienes inmuebles y los dueños de cada interés sobre los mismos recobran de dicha compensación el mismo interés proporcional que tenían en la propiedad expropiada. *Pueblo* v. *Registrador*, 64 D.P.R. 130, 138. El hecho de que el título de dominio sobre bienes expropiados esté sujeto a un contrato de arrendamiento de ordinario no tiene efecto alguno sobre la compensación que el gobierno deba pagar por dicho título. Se determina el valor del título de dominio y entonces se le deduce el valor del arrendamiento. "El valor del término de los arrendatarios por años era parte del valor del título de dominio en sí, y cualquier compensación separada para ellos constituía una obvia duplicidad, en lo que atañe al [gobierno]." El Juez Learned Hand en *United States* v. *City of New York*, 165 F.2d 526, 530 (C.A. 2, 1948); *United States* v. *25.936 Acres of Land, etc.*, 153 F.2d 277, 279 (C.A. 3, 1946). En tanto en cuanto el arrendamiento menoscaba el valor del título de dominio, el arrendatario debe ser compensado de la suma que represente el valor total del título de dominio y no en adición a éste. *Silberman* v. *United States*, 131 F.2d 715 (C.A. 1, 1942); *State, By and Through State Highway Com'n* v. *Burk*, 265 P.2d 783, 800 a 802 (Ore., 1954); *United States* v. *Honolulu Plantation Co.*, 182 F.2d 172 (C.A. 9, 1950); *Meadows* v. *United States*, 144 F.2d 751 (C.A. 4, 1944); *Eagle Lake Improvement Co.* v. *United States*, 160 F.2d 182 (C.A. 5, 1947); *Bogart* v. *United States*, 169 F.2d 210, 213 (C.A. 10, 1948); *United States* v. *53 ¼ Acres of Land, etc.*, 176 F.2d 255 (C.A. 2, 1949); *Mayor, etc., of Baltimore* v. *Gamse & Bro.*, 104 Atl. 429 (Md., 1918); 1 Orgel, *Valuation Under Eminent Domain*, 2da. ed., págs. 461 a 463, 483; 4 Nichols, *Eminent Domain*, 3ra. ed., págs. 162, 171 a 173; 2 id., págs. 36 a 39, 51; Anotación, 166 A.L.R. 1211.(³)

---

(³) En el tomo 4 de Nichols, supra, pág. 163, se dice que ". . . en casos excepcionales, cuando el valor agregado de los intereses separados excede el valor del título de dominio, tales intereses pueden valorarse separadamente", citándose *Mayor, etc., of City of Baltimore* v. *Latrobe*, 61 Atl. 203

■■ "Siempre y cuando que el gobierno haga un esfuerzo razonable para incluir como demandados a todas las personas que pudieran tener un interés en los bienes expropiados, el gobierno no tiene interés como tal en la distribución de la compensación pagada a los varios reclamantes." *Pueblo* v. *632 Metros Cuadrados de Terreno*, supra, pág. 971. El Pueblo no hizo en este caso ". . . un esfuerzo razonable para incluir como demandados a todas las personas que pudieran tener un interés en los bienes expropiados . . .". Aun cuando el contrato no estaba inscrito, el gobierno sabía que la Floor Coverings estaba en posesión de los bienes y operaba allí una fábrica de alfombras. Por tanto cometió error al no incluir como demandada a la Floor Coverings y al consentir en que Torres retirara todo el depósito. Si por cualquier motivo la Floor Coverings no pudiera recobrar de Torres los daños a que tenga derecho por la pérdida de su arrendamiento, el gobierno sería responsable de ellos. Pero entre Torres y el gobierno, Torres debe pagar dichos daños a la Floor Coverings, *siempre y cuando que el depósito constituya el valor en el mercado del título de dominio.*

El tribunal sentenciador resolvió que el depósito sólo cubría el interés de Torres en el título de dominio y no el interés de la Floor Coverings en el arrendamiento, ya que el Pueblo permitió que Torres retirara todo el depósito, teniendo conocimiento de la existencia del contrato de arrendamiento. Pero el hecho de que el Pueblo—ya por descuido o por igno-

---

(Md., 1905), y haciéndose referencia además a *City of St. Louis* v. *Rossi*, 64 S.W.2d 600 (Mo., 1933). Al mismo efecto, 1 Orgel, supra, págs. 461 a 463, 470 et seq. Pero tales casos envuelven hechos peculiares. Ninguno de ellos es un caso en que como ocurre aquí tenemos un arrendamiento corriente por término fijo del dueño del título de dominio. Las únicas circunstancias especiales aquí—el embrollo de procedimiento que surgió porque el Pueblo indebidamente no incluyó como demandado a la arrendataria y porque Torres primeramente expuso pero finalmente retiró la teoría al efecto de que la compensación por el arrendamiento debía otorgársele a la Floor Coverings en adición a la compensación de Torres por el valor total del título de dominio—no podía afectar el valor de los intereses tomados de las partes respectivas. Por consiguiente es innecesario pasar sobre la cuestión de si tan excepcional caso podría alguna vez surgir en esta jurisdicción.

rancia de la ley en cuanto a los derechos de una persona con un arrendamiento no inscrito—indebidamente le permitiera a Torres retirar todo el depósito que representaba el valor total de los bienes expropiados, no juega papel alguno sobre las cuestiones de (1) el valor del título de dominio y (2) la parte de aquél a la cual la Floor Coverings tenía derecho en virtud de su arrendamiento.[4]

El caso de *Musanti* v. *State*, 131 N.Y.S. 20 (N.Y., 1911), en que descansa el tribunal sentenciador, no es de aplicación. La opinión de una página emitida por la Corte de Reclamaciones de Nueva York en dicho caso meramente resuelve que si el expropiante indebidamente paga *todo* el valor al dueño del título de dominio, debe pagar también al arrendatario por su interés en el mismo. Convenimos con esta decisión. Como hemos indicado, si la Floor Coverings no puede recobrar de Torres, el Pueblo será responsable a la Floor Coverings por su interés. Pero la cuestión aquí es diferente: ¿Es el gobierno responsable a un arrendatario *en adición* a su responsabilidad para con el dueño del título de dominio por el valor total del mismo? Por los motivos ya expuestos contestamos esta pregunta en la negativa.

■■ El art. 2, párrafo 9 de la Carta Orgánica, 48 U.S.C.A., sec. 737, I L.P.R.A. pág. 55, que estaba en vigor cuando surgió este caso, no exige un resultado diferente.[5]

---

[4] La demanda dice lo siguiente:

| "*Personas Con Interés* | *Compensación* |
|---|---|
| "(*a*) Carlos J. Torres y su esposa Estela Alcaide como dueños de la parcela | $1,528.52 |
| "(*b*) Carlos J. Torres y su esposa Estela Alcaide como dueños de ciertas estructuras y mejoras enclavadas en la parcela | 17,747.50 |
| | $19,276.02" |

El gobierno debió añadir a la Floor Coverings como parte con un interés en estas cantidades. Pero el dejar de hacerlo no cambia el hecho de que en sustancia el Pueblo, habiendo expropiado el título de dominio, alegó que éste valía la suma depositada.

[5] En la Sección 9 del Artículo II de la Constitución del Estado Libre Asociado de Puerto Rico aparece exactamente la misma disposición: "No se tomará o perjudicará la propiedad privada para uso público a no ser

Es cierto que su disposición sobre una justa compensación cuando propiedad particular es "tomada" o *"perjudicada"* por el Gobierno de Puerto Rico, es más amplia que los términos de la Enmienda V de la Constitución de los Estados Unidos. *Pueblo v. Soc. Agríc. Mario Mercado e Hijos,* 72 D.P.R. 792, 798 y 799; *Pueblo v. García,* 66 D.P.R. 504, 510 a 514; 2 Nichols, supra, sec. 6.38 [3], págs. 296 et seq. Pero no sabemos de caso o tratadista alguno que exprese el criterio de que una disposición constitucional que provea compensación tanto por tomar como por perjudicar bienes, requiera que el gobierno pague al dueño del título de dominio su valor total y además pague a un arrendatario por término fijo por su interés. *Cf. United States v. General Motors Corp.,* 323 U.S. 373, 379 y 380, según aparece citado en el escolio 23, *infra.*

Nada hay en nuestros estatutos que indique una conclusión contraria. Es innecesario que nos detengamos a determinar el alcance exacto del lenguaje del tercer párrafo del art. 282 del Código Civil de 1930, ya que el mismo fué eliminado del art. 282 por la Ley núm. 300, Leyes de Puerto Rico, 1946 (.(1) pág. 775).([6]) La medida de compensación en casos de expropiación no fué ampliada por la Ley núm. 105, Leyes de Puerto Rico, 1948 ((1) pág. 241), que enmendó el

mediante el pago de una justa compensación y de acuerdo con la forma provista por ley." 1 L.P.R.A. pág. 189.

([6]) El art. 282 del Código Civil de 1930 prescribía:

"Nadie podrá ser privado de su propiedad sino por autoridad competente y por causa justificada de utilidad pública, previa siempre la indemnización correspondiente.

"Si no precediere este requisito, las cortes de distrito ampararán, y en su caso, reintegrarán en la posesión al expropiado.

"La indemnización comprenderá no sólo el valor de la cosa de la cual el propietario es privado, sino que también una remuneración por los daños y perjuicios que se le ocasionen con la privación de la propiedad."

Dicho art. 282, según fué enmendado por la Ley núm. 300 de 1946 —31 L.P.R.A. sec. 1113—prescribe ahora como sigue:

"Nadie podrá ser privado de su propiedad sino por autoridad competente, por causa justificada de utilidad pública o beneficio social, y mediante el pago de una justa compensación que se fijará en la forma provista por ley."

art. 4 de la Ley de Expropiación, 32 L.P.R.A. sec. 2905. El art. 4, después de prescribir que una acción de expropiación será *in rem*, dispone que "La demanda podrá ir dirigida contra los dueños de la propiedad, sus ocupantes y todas las demás personas con derecho o interés sobre la misma; o podrá ir dirigida contra la propiedad en sí."[7] Esta disposición está de acuerdo con nuestro criterio de que toda persona con un interés en el terreno y con un derecho a compensación tiene derecho a notificación y a audiencia sobre su reclamación. *Pueblo* v. *632 Metros Cuadrados de Terreno*, supra. Pero la Ley núm. 105 no restituyó el párrafo tercero del art. 282 del Código Civil de 1930 ni modificó el art. 282 en forma alguna. Tampoco, nada de lo hallado en los arts. 5 (*a*) y (*b*) de la Ley de Expropiación, según fué enmendada, 32 L.P.R.A. secs. 2907 y 2908, nos lleva a un resultado diferente.

▎ El art. 1461 del Código Civil, ed. de 1930, 31 L.P.R.A. sec. 4068, no juega papel alguno en este caso en tanto en cuanto se refiere a la naturaleza y cuantía de la compensación al arrendatario.[8] Por motivos que ya hemos expuesto,

---

[7] El art. 4, según fué enmendado por la Ley núm. 105 de 1948, dispone en parte lo siguiente:

"Dicho procedimiento de expropiación será in rem, y el demandante puede incluir, si así lo cree conveniente en la misma demanda, una o más propiedades, pertenezcan o no al mismo dueño; *Disponiéndose*, que cuando la totalidad de una propiedad a ser expropiada sea el resultado de la agrupación de dos o más propiedades o parcelas que por colindar entre sí forman un solo cuerpo de bienes, bien pertenezcan o no al mismo dueño, dicha propiedad a ser expropiada podrá describirse en la demanda como si fuera un solo cuerpo de bienes a todos los fines del procedimiento. La demanda podrá ir dirigida contra los dueños de la propiedad, sus ocupantes y todas las demás personas con derecho o interés sobre la misma; o podrá ir dirigida contra la propiedad en sí. Cuando ocurriere esto último, en la demanda se mencionarán, hasta donde sea posible al demandante determinarlo, los nombres de todas aquellas personas que como dueños, ocupantes, o poseedores de cualquier derecho o interés sobre la propiedad deben ser notificados del procedimiento a los fines del derecho que puedan tener a la compensación que se fije por el valor de la propiedad expropiada, o a los daños que el procedimiento ocasione."

[8] El art. 1461 dice así:

"El comprador de una finca arrendada tiene derecho a que termine el arriendo vigente al verificarse la venta, salvo pacto en contrario y lo dispuesto en la ley hipotecaria."

cuando el gobierno expropió el título de dominio en este caso, el arrendatario tenía derecho a que se le compensara por su interés en el arrendamiento aun cuando el contrato de arrendamiento no estuviere inscrito en el registro de la propiedad. El art. 1461 del Código Civil autoriza al comprador de bienes inmuebles a terminar un arrendamiento no inscrito siempre y cuando que al arrendatario se ". . . le indemnice los daños y perjuicios que se le causen." No podemos ver cómo el art. 1461 puede interpretarse en el sentido de que aumenta las obligaciones del gobierno hacia una persona con un arrendamiento no inscrito. Así resolverlo equivaldría a conceder más daños a tal arrendatario que a uno cuyo arrendamiento estuviese inscrito. Ni la anterior Carta Orgánica, ni nuestros estatutos referentes a compensación, ni el art. 1461 exigen tan anómalo resultado. La naturaleza y cuantía de la compensación a un arrendatario en una acción de expropiación no depende de si su contrato está inscrito o no; recibe la misma compensación en ambos casos.

 Durante el juicio Torres asumió exactamente la misma posición que hemos expuesto. Es cierto que en cierto momento en este caso él adoptó una teoría diferente y solicitó permiso para radicar una segunda contestación enmendada alegando que la suma depositada no cubría el valor total de la propiedad. Sin embargo, esta moción nunca se declaró con lugar y Torres la abandonó. Véase el escolio 2. Por el contrario, volvió a su teoría original y repetidamente dijo a través de todo el juicio (1) que el dinero depositado y retirado por él constituía compensación adecuada por el valor total de los bienes, y (2) que como él había retirado el depósito, él y no el gobierno debía compensar a la Floor Coverings por los daños, de haber algunos, ocasionados por la pronta terminación de su arrendamiento; pero que como cuestión de hecho la Floor Coverings no había sufrido tales daños.

---

"Si el comprador usare de este derecho, el arrendatario podrá exigir que se le deje recoger los frutos de la cosecha que corresponda al año agrícola corriente y que el vendedor le indemnice los daños y perjuicios que se le causen."

Todas las partes convienen en que Torres es solvente. En vista de la posición que él asumió en el juicio al efecto de que los daños, de haber algunos, debidos a la Floor Coverings en virtud del arrendamiento deben ser pagados por él, el error del gobierno al no incluir a la Floor Coverings como demandada y al permitir que Torres retirara todo el depósito deja de tener significación alguna. Véase el texto que precede al escolio 4. La única otra responsabilidad del gobierno era depositar la compensación justa por toda la propiedad. *Pueblo* v. *632 Metros Cuadrados de Terreno*, supra. Las partes de quienes se expropia tienen el peso de la prueba para demostrar que el depósito no es suficiente.(⁹) Torres no hizo esto. Por el contrario, admitió que la suma depositada representaba el valor en el mercado de todos los bienes. De esto surge que cualquier compensación que se pueda conceder a la Floor Coverings por haber perdido su arrendamiento debe venir de Torres—quien es solvente y quien retiró todo el depósito—más bien que por vía de depósito adicional del gobierno para dicha compensación. El tribunal sentenciador cometió error al ordenarle al Pueblo y no a Torres que pagase dichos daños a la Floor Coverings.

## II

Pasemos ahora a la cuestión de la suma a que tiene derecho la Floor Coverings por la terminación de su arrendamiento con motivo del procedimiento de expropiación. En términos generales, cuando se expropia todo el balance de un arrendamiento, el arrendatario tiene derecho al ". . . valor del uso y ocupación de los bienes arrendados por el resto del . . . término . . . menos el canon estipulado que el arrenda-

---

(⁹)En un caso de expropiación sobre la cuestión de compensación ". . . (1) el demandado es en efecto el demandante; (2) éste debe presentar su evidencia en primer lugar; y (3) tiene el peso de la prueba en cuanto a valoración." *Pueblo* v. *632 Metros Cuadrados de Terreno*, supra, pág. 976; *Pueblo* v. *García*, supra; *Camino* v. *Tribl. de Expropiaciones*, 70 D.P.R. 152 ; *United States ex rel. T. V. A.* v. *Powelson*, 319 U.S. 266, 273 y 274; Dolan, *Present Day Court Practice in Condemnation Suits*, 31 Va. L. Rev. 9, 17; 5 Nichols, supra, pág. 198.

tario tendría que pagar por tal uso y ocupación." *United States* v. *Petty Motor Co.*, 327 U.S. 372, 381; *United States* v. *Westinghouse Co.*, 339 U.S. 261.([10]) La Floor Coverings trató de ampararse en esta regla. Presentó a Torres y a José M. Canals, un perito, como testigos sobre la cuestión del valor en el mercado del contrato de arrendamiento. Torres fijó su valor entre $500 y $600 al mes, mientras que Canals fijó una cifra aproximada de $325 al mes, en contraste con los $200 mensuales del contrato.

El tribunal sentenciador concedió a la Floor Coverings la suma de $4,000 por la pérdida de su arrendamiento. Sus conclusiones sobre este punto leen así:

". . . que lo que verdaderamente la Floor Coverings Co. of P. R., Inc., estaba pagando por canon o renta del edificio o edificios, no eran escuetamente $200.00 mensuales, sino $200.00 mensuales y $4,176.66 en mejoras para un término de cinco años, de acuerdo ello con los términos del contrato. O sea, una inversión promedio mensual prorrateada de $269.60 por mes. Este Tribunal le da crédito a lo declarado por don Carlos J. Torres respecto al valor rental de lo expropiado en la suma de $500.00 a $600.00 mensuales en su primera declaración. Ello, en unión a la declaración del perito Canals y a la ausencia de prueba de las otras partes sobre el valor de la propiedad en el mercado, para de esa base valorar el derecho al arrendamiento de la interventora, nos mueve a concluir que el arrendamiento de la Floor Coverings Co. of P. R., Inc., tenía un valor de Cuatro Mil Dólares ($4,000.00). Declaramos, además que el

([10]) Al mismo efecto, *Department of Public Works and Buildings* v. *Bohne*, 113 N.E.2d 319; 324 (Ill., 1953); *United States* v. *Certain Lands, etc.*, 183 F.2d 320, 321 (C.A. 3, 1949); *United States* v. *425,031 Square Feet of Land, etc.*, 187 F.2d 798 (C.A. 3, 1951); *United States* v. *Advertising Checking Bureau*, 204 F.2d 770 (C.A. 7, 1953); Anotación, 3 A.L.R.2d 286, 290; 4 Nichols, supra, págs. 175 a 177.

Resolvimos en *Junta Escolar de Carolina* v. *Saldaña et al.*, 14 D.P.R. 348, 369 a 376, que un arrendatario tiene derecho a compensación en una acción de expropiación por la pérdida de su arrendamiento. Sin embargo, en tanto en cuanto respecta a la medida de daños según ésta se describe a la pág. 370 del caso de *Saldaña*, notamos que dicho caso fué resuelto antes de la enmienda del art. 282 del Código Civil según aparece del escolio 6. Véanse también *American R. R. Co. of P. R.* v. *Quiñones*, 15 D.P.R. 1; *Veve* v. *Lloreda, Juez de Distrito*, 17 D.P.R. 564.

'market value method' no es el método aplicable para valorar en el presente caso el ('leasehold interest') valor del perjuicio sufrido por la arrendataria por la pérdida de su arrendamiento, sino el de la capitalización de la renta.''

No aparece con toda claridad cómo llegó el tribunal sentenciador a la suma de $4,000. Resolvió que aún faltaban 17 meses para la terminación del arrendamiento.[10a] Y pudo haber concedido 17 × $230.40, o aproximadamente $3,915, toda vez que la suma de $230.40 es la diferencia entre (*a*) la cifra de $500 mensuales dada por Torres en su testimonio original como el valor del arrendamiento en el mercado y (*b*) el canon de $200 mensuales más $69.60 por mes pagados por la Floor Coverings por mejoras hechas al edificio, y prorrateado a través del período de cinco años del arrendamiento. De acuerdo con el testimonio de Canals la suma a recobrar sería considerablemente menor. El tribunal sentenciador desde luego no venía obligado a seguir indefectiblemente el testimonio del perito. *Pueblo* v. *Soc. Agríc. Mario Mercado e Hijos,* supra, pág. 815. Pero tiene que haber alguna base racional para la cuantía de su sentencia. En cuanto a este punto nos confrontamos con varias dificultades. Primeramente, como se verá más adelante, Torres retiró las anteriores cifras en testimonio posterior. Véase el texto que precede al escolio 14. En segundo lugar, no podemos determinar hasta qué punto el tribunal sentenciador usó "capitalización de la renta" en vez del "valor en el mercado" para fijar el valor del arrendamiento. En tercer lugar, aun cuando el tribunal sentenciador no concedió gastos de mudanza propiamente dichos, véase la Parte III, aparentemente tomó tales gastos en consideración al fijar el valor del arrendamiento, citando con aprobación del caso de *United States* v. *Petty Motor Co.,* 147 F.2d 912 (C.A. 10, 1945). Pero el tribunal sentenciador pasó por alto el hecho de que este caso ya había sido revocado por la Corte Suprema. *United States* v. *Petty*

---

[10a] Pero véase el texto que precede al escolio 18 en cuanto al período restante del arrendamiento.

*Motor Co.*, supra. En quinto lugar, ninguna de las partes discute en su alegato cómo llegó el tribunal sentenciador a la cantidad de $4,000. Sin embargo, dejamos a un lado todas estas cuestiones. No podemos sostener la conclusión del tribunal sentenciador en cuanto a esta partida porque entra en juego otro principio en este caso.

Si por ley se fija válidamente un precio máximo a mercancía que es luego expropiada por el gobierno, el dueño no tiene derecho, como justa compensación, a más del precio máximo de dicha mercancía, en ausencia de circunstancias especiales que representen vicisitudes peculiarmente aplicables al dueño. *United States* v. *Commodities Corp.*, 339 U.S. 121. La Corte dice a la pág. 124 que ". . . los precios máximos de mercancía que se tiene para la venta representaban no solamente el valor en el mercado sino de hecho el único valor que podía obtenerse por la mayoría de los dueños. Bajo estas circunstancias dichos precios no pueden ignorarse al decidir lo que constituye una justa compensación." Añadió la Corte a la pág. 125: "Creemos que el propósito del Congreso y las necesidades de una economía de guerra exigen que los precios máximos sean aceptados como la medida de una justa compensación, hasta donde esto se pueda hacer consistentemente con los objetivos de la Enmienda V." [11]

[11] "Los controles de precios y alquileres restringen la libertad de los dueños de hacer negocios con sus bienes, pero las pérdidas que puedan ocurrir debido a tales restricciones no son compensables porque no ha habido 'adquisición'." Nota, *Recent Constitutional Development on Eminent Domain*, 4 Vand. L. Rev. 673, citando *Bowles* v. *Willingham*, 321 U.S. 503, 517 (control de alquileres); *Yakus* v. *United States*, 321 U.S. 414 (control de precios). Véanse *United States* v. *Felin & Co.*, 334 U.S. 624; *Gladding, McBean & Co.* v. *United States*, 101 F. Supp. 358 (Ct. Cl., 1951); *Safeway Stores* v. *United States*, 93 F. Supp. 900 (Ct. Cl., 1950) cert. denegado 341 U.S. 953; *Oro Fina Consolidated Mines* v. *United States*, 92 F. Supp. 1016 (Ct. Cl., 1950); Braucher, *Requisition at a Ceiling Price*, 64 Harv. L. Rev. 1103; Nota, *OPA Ceiling Prices as Evidence of Value*, 60 Harv. L. Rev. 132; 65 Harv. L. Rev. 1061; Frank, *The United States Supreme Court: 1949–50*, 18 U. Chi. L. Rev. 1, 14 y 15; Nota, Marcus, *The Taking and Destruction of Property under a Defense and War Program*, 27 Cornell L. Q. 476, 528; Nota, *Determination of Just Compensation in a Controlled Market*, 17 U. Chi. L. Rev. 125; 1 Orgel, supra, segunda ed. págs. 122 a 132; 4 Nichols, supra, págs. 61 a 63; id., 1954 Cum. Supp. pág. 56.

 Es innecesario determinar qué efecto los precios máximos para alquileres fijados bajo nuestra Ley de Alquileres Razonables, según ha sido enmendada—17 L.P.R.A. secs. 181 et seq.—tendrían sobre la compensación a que tendría derecho el dueño del título de bienes inmuebles expropiados.(¹²) La cuestión aquí envuelta no es el valor del título de dominio sino el de un arrendamiento. A tenor con la Ley de Alquileres Razonables, un precio máximo de $200 al mes fué fijado para este arrendamiento. En el caso de *Commodities* la Corte Suprema específicamente rechazó la teoría de que el dueño tiene derecho, además del precio máximo, a un "valor de retención"; v.g., una concesión por el precio que el dueño pudiera haber obtenido si se le hubiera permitido retener la mercancía hasta que se hubieran levantado las restricciones sobre los precios. Pero aun cuando la regla fuera en sentido contrario y se permitiera el valor de retención, nada hay en los autos que indique que el precio máximo de $200 al mes pudiera haber sido modificado durante los pocos meses restantes del arrendamiento en este caso. Aparte de la cuestión del efecto de un precio máximo para alquileres sobre el valor en el mercado del título sobre los bienes inmuebles, véase el escolio 12, la misma regla establecida en el caso de *Commodities* para el control de precios de alimentos y mercancías se aplica al valor de la parte pendiente de un arrendamiento de bienes inmuebles que está bajo el control de alquileres. En *United States* v. *Delano Park Homes*, supra, se resolvió que, al determinar el valor de terrenos expropiados, el tribunal sentenciador correctamente tomó en consideración que el expropiado no podía construir en dichos terrenos para dicha fecha porque no había podido conseguir una prioridad para comprar materiales de construcción durante la emer-

---

(¹²) Toda vez que el precio de venta del título de dominio sobre bienes inmuebles no está controlado por nuestra Ley de Alquileres Razonables, el precio máximo hasta cierto punto afecta, pero no controla, el precio en el mercado del referido título. Véanse *United States* v. *Delano Park Homes*, 146 F.2d 473 (C.A. 2, 1944); *United States* v. *49,375 Square Feet of Land, etc.*, 92 F. Supp. 384, 393 (Dist. Ct., N.Y., 1950).

gencia de guerra. El Juez Learned Hand dijo en el caso de *Delano*, a la pág. 474: ". . . cuando la autoridad competente ha fijado precios máximos, o ha negado a los dueños algún uso específico de sus bienes, constituye un patente desprecio de su autoridad ya indirectamente conceder un precio mayor en expropiación, o ya permitir que se fije el precio ignorando la restricción fijada." Véase *United States* v. *Sanitary District*, 149 F.2d 951 (C.A. 7, 1945). *Cf. Pueblo* v. *Franceschi*, 72 D.P.R. 554, 565 a 567. Por consiguiente, el valor del arrendamiento en este caso no puede fijarse a un tipo mayor del precio máximo, que era la misma suma—$200 al mes—que el tipo fijado en el contrato de arrendamiento. De conformidad con lo antes expuesto, la Floor Coverings no sufrió daño alguno cuando se le privó de la parte aún pendiente de su contrato de arrendamiento.

Como ya se ha indicado ". . . el precio máximo . . . debe aceptarse como la máxima medida de compensación a menos que [el dueño] haya sostenido el peso de probar condiciones y vicisitudes especiales que le son peculiarmente aplicables. *Cf. Marion & Rye Valley Ry. Co.* v. *United States*, 270 U.S. 280, 285." *United States* v. *Commodities Corp.*, supra, pág. 128. De los autos nada surge al efecto de que la Floor Coverings sostuvo el peso de probar vicisitudes peculiares tales que la eximan de la regla general al efecto de que el precio máximo es lo que rige. En verdad, en su alegato ante este Tribunal la Floor Coverings ni siquiera discute el efecto del precio máximo sobre su reclamación, no empece el hecho de que esta cuestión fué presentada y argumentada por Torres tanto en el tribunal sentenciador como en éste.

El testimonio de Torres no demuestra ninguna vicisitud excepcional a la Floor Coverings. Declaró como testigo de ésta que la parte restante del arrendamiento valía de $500 a $600 al mes. Más tarde fué llamado nuevamente a la silla de testigos por su propio abogado y retiró estas cifras porque en su testimonio original él no había tomado en consideración (1) que se había fijado un precio máximo de $200 al mes

para este arrendamiento bajo la Ley de Alquileres Razonables y (2) que el contrato de arrendamiento sólo tenía poco tiempo de vida.([13]) Por tanto convenimos con la manifestación hecha varias veces por el tribunal sentenciador durante el juicio al efecto de que el último testimonio de Torres "mató" su testimonio original en cuanto al valor en el mercado del arrendamiento.([14]) El hecho de que Torres—y aparentemente Canals—no tomaran en consideración el precio máximo privó sus testimonios de valor alguno sobre esta cuestión.

Hubo alguna prueba al efecto de que sería difícil y costoso para la Floor Coverings obtener otro edificio razonablemente accesible para los trabajadores entrenados en la manufactura de alfombras. Fuera del hecho de que aquí también tal testimonio pierde su validez porque los testigos no tomaron en consideración la posibilidad del control de precios al estimar el canon que Floor Coverings hubiera tenido que pagar al tomar en arrendamiento otro edificio para su fábrica, los problemas de alquilar un edificio satisfactorio para fines comerciales durante un período de control de alquileres no eran sólo de la Floor Coverings. Además, de ordinario el gobierno no viene obligado a pagar por bienes expropiados a base de ". . . un valor especial al dueño debido a su adaptabilidad a sus necesidades . . ." *United States* v. *Cors*, 337 U.S. 325, 332; *United States* v. *General Motors*, supra, pág. 379; 4 Nichols, supra, págs. 12 y 13, 45. El gobierno ". . . debe pagar únicamente por lo que expropia y no por las oportunidades que el dueño pueda perder como resultado de la expropiación . . .". Dolan, *Consequential Damages in Federal Condemnation*, 35 Va. L. Rev. 1059. La fórmula es el valor de los bienes expropiados, no lo que pueda

---

([13]) El valor en el mercado de un contrato de arrendamiento a largo plazo que aún no ha expirado es mayor que el de un contrato comparativamente corto. *United States* v. *Certain Lands, etc.,* supra.

([14]) En vista de estas manifestaciones del tribunal sentenciador es extraño, como hasta ahora hemos indicado, que el tribunal sentenciador basara su conclusión de hecho en cuanto al valor del arrendamiento en este testimonio de Torres.

costar al expropiado sustituirlos en relación con un negocio anteriormente establecido en ellos. 4 Nichols, supra, págs. 415 y 416.

Una cuestión diferente se nos presentaría si el gobierno fijara un precio máximo para algún artículo o para la renta de un inmueble específico a fin de expropiarlo a ese precio. *United States* v. *Felin & Co.*, supra, pág. 646, opinión concurrente de tres jueces; Braucher, supra, pág. 1110; Nota, *Determination of Just Compensation in a Controlled Market*, 17 U. Chi. L. Rev. 125, 126; *United States* v. *Commodities*, supra, pág. 141, opinión disidente. Pero eso no ocurrió aquí. Toda vez que, como hemos visto, de ordinario un arrendatario tiene derecho únicamente a la suma en que el valor en el mercado de un arrendamiento excede el canon convenido, la Floor Coverings—que no podía bajo la Ley de Alquileres Razonables haber traspasado su arrendamiento a un canon mayor que el fijado en el contrato de $200 mensuales—no tiene derecho, con excepción del dinero que invirtió en las mejoras que a continuación se mencionan, a ninguna compensación por su arrendamiento.

El contrato exigía a la Floor Coverings que reconstruyera un establo para poderlo usar como fábrica de alfombras de conformidad con planos y especificaciones que se hicieron parte del mismo. A tenor con el contrato el dueño contribuiría con $5,032.13 por el costo de estas alteraciones, y cualquier suma en exceso sería pagada por la arrendataria. Este exceso resultó en $4,176.66. Además de pagar el canon máximo de $200 al mes, la Floor Coverings en consecuencia venía obligada según el contrato a realizar mejoras permanentes que aumentarían el valor de la propiedad, las cuales le costaron $4,176.66. De ordinario, tales mejoras serían tomadas en consideración al compensar al arrendatario por el valor en el mercado del período restante de su arrendamiento aun donde, como ocurre aquí, las mejoras permanentes revertirían al dueño a la terminación del arrendamiento. *Department of Public Works and Buildings* v. *Bohne*, supra, 324;

*United States* v. *425,031 Square Feet of Land, etc.,* supra, 800; *Mayor etc., of Baltimore* v. *Gamse & Bro.,* 104 Atl. 428 (Md., 1918); McCormick, *The Measure of Compensation in Eminent Domain,* 17 Minn. L. Rev. 461, 473, escolio 36. Pero como hemos visto, la Floor Coverings no tiene derecho a compensación por la pérdida de su arrendamiento propiamente dicho, en vista del precio máximo de $200 mensuales como canon de arrendamiento por los bienes. Bajo estas circunstancias peculiares, toda vez que la Floor Coverings fué privada del uso de la fábrica de alfombras durante el resto del término de su arrendamiento a un canon máximo de $200 al mes, la misma tiene derecho a recibir, de la suma fijada como el valor del título de dominio, la parte proporcional de dichos $4,176.66 correspondiente al período pendiente del contrato de arrendamiento. De lo contrario resultaría en un inmerecido beneficio para Torres, quien se hubiese visto obligado a permitirle a la Floor Coverings que usara la propiedad según mejorada por ésta al canon máximo de $200 mensuales durante el período restante del arrendamiento, si la propiedad no hubiera sido expropiada. *Cf. Department of Public Works and Buildings* v. *Bohne,* supra; *United States* v. *425,031 Square Feet of Land, etc.,* supra; *Mayor, etc., of Baltimore* v. *Gamse & Bro.,* supra.

Al discutir la anterior partida, la Floor Coverings sostiene que tiene derecho a $1,183.37. Llega a esta suma dividiendo $4,176.66—suma con que contribuyó para las mejoras—por 60 meses, el término del arrendamiento, obteniendo una cifra mensual de $69.61. Entonces multiplica $69.61 por 17, en vista de su teoría de que el período pendiente del arrendamiento era de 17 meses, llegando a la suma de $1,183.37.

Aceptamos la cifra mensual de $69.61.([15]) Pero no podemos convenir en que la Floor Coverings tenía derecho a

---

([15]) La Floor Coverings pudo concebiblemente argüir que un período menor de 60 meses—v.g., desde la terminación de las mejoras hasta el fin del arrendamiento—debió usarse como el divisor, lo cual le daría una cifra mensual un poco más alta que $69.61. Pero la Floor Coverings no hace

dicha suma durante 17 meses. Floor Coverings arguye (1) que el contrato de arrendamiento disponía que el término de cinco años empezaría a correr cuando se terminaran las mejoras, y (2) que toda vez que las mejoras se terminaron el 19 de septiembre de 1946 y la propiedad fué expropiada el 19 de abril de 1950, el período pendiente del arrendamiento era de 17 meses.([16]) La dificultad con esta contención es que el contrato dispone que empezaría a correr cuando la Floor Coverings empezara a reconstruir el edificio, con un disponiéndose al efecto de que el canon sería $100 al mes hasta que las mejoras se terminasen y $200 al mes de ahí en adelante.([17]) Bajo estas disposiciones del contrato de arrendamiento la Floor Coverings pagó $100 al mes como canon durante dos meses, empezando el 7 de mayo de 1946, y $200 al mes de ahí en adelante. El término de cinco años por consiguiente empezó a correr el 7 de mayo de 1946. El gobierno permitió a la Floor Coverings que permaneciera en posesión de la propiedad y siguiera operando su fábrica de

este argumento. Y los autos guardan silencio en cuanto a la fecha exacta en que la Floor Coverings empezó a disfrutar de todas o de parte de las mejoras. Por consiguiente seguimos a la Floor Coverings al usar el período de 60 meses para amortizar la contribución de ella a las mejoras.

([16]) Aun cuando la Floor Coverings tuviera razón al sostener que el arrendamiento disponía que los cinco años empezarían a correr cuando se terminaran las mejoras, de los autos no surge claro cuándo esto ocurrió. La Floor Coverings ofreció prueba fijando el 19 de septiembre de 1946. Pero ella empezó a pagar renta a razón de $200 mensuales el 7 de julio de 1946. El contrato de arrendamiento disponía que el canon sería de $100 mensuales hasta que se terminaran las mejoras y luego de $200 al mes. Véase el escolio 17. *Quaere*, aun bajo la teoría de la Floor Coverings, si los cinco años empezaron a correr el 7 de julio de 1946 en vez del 19 de septiembre de 1946.

([17]) El segundo párrafo del contrato, otorgado el 30 de abril de 1946, dispone que el mismo tendrá vigencia ". . . durante el término de cinco años a partir de la fecha indicada en el párrafo vigésimo quinto."

El párrafo vigésimo quinto dispone como sigue: "Desde la fecha en que el subarrendatario empiece las mejoras y reconstrucción del rancho y hasta la fecha de su terminación, el canon mensual a pagarse será de Cien Dólares ($100); a la terminación de las mejoras el canon será de Doscientos Dólares ($200) mensuales según se ha convenido anteriormente.

"Disponiéndose que los trabajos a llevarse a cabo para dar comienzo a las mejoras empezarán no más tarde de treinta días desde el otorgamiento de esta escritura."

alfombras en ella hasta fines de la primera semana de agosto de 1950. En consecuencia, usó la propiedad durante 4 años y 3 meses, y la parte pendiente de su arrendamiento eran 9 meses. Por tanto, la Floor Coverings tenía derecho a $69.61 × 9, o sea $626.49.([18])

La Floor Coverings apela de la sentencia en tanto en cuanto ésta no la compensó por (1) costos de la mudanza, desmontar su equipo y volverlo a montar en otro sitio, y (2) pérdida de negocios durante las dos semanas que invirtió en mudar su fábrica de alfombras.([19]) No encontramos error en estos pronunciamientos del ·tribunal sentenciador.

Cuando el gobierno expropia únicamente parte del término pendiente de un contrato de arrendamiento, los gastos de mudanza y otras partidas relacionadas con ésta son tomados en consideración al determinar la justa compensación para el expropiado. *United States* v. *General Motors Corp.*, supra. Pero cuando como en este caso se expropia el título de dominio—que incluye la parte pendiente del arrendamiento—el arrendatario no tiene derecho a compensación por tales costos de mudanza o por la pérdida de negocios mientras se muda. *United States* v. *Westinghouse*, supra; *United States* v. *Petty Motor Co.*, supra. La razón por la cual se toman en consideración estas partidas en el primer caso y se rechazan en el segundo es la siguiente: "Existe una diferencia fundamental

---

([18]) Por los motivos expuestos en la opinión, no podemos convenir con la conclusión de hecho del tribunal sentenciador al efecto de que las mejoras deben calcularse a base de 17 meses. De cualquier modo, el tribunal sentenciador no hizo una concesión por separado de esta partida. Por el contrario, como hemos visto, el tribunal sentenciador añadió $69.60 por mes al canon de $200 mensuales y entonces, comparando la cifra de $269.60 al mes con el alegado valor en el mercado de $500 mensuales, concedió a la Floor Coverings la suma de $4,000 por la pérdida del arrendamiento. Véase el texto que precede al escolio 10a y el escolio 19.

([19]) La Floor Coverings también señaló como error el no haber el tribunal sentenciador concedídole una parte proporcional del costo de las mejoras permanentes hechas por ella, correspondiente al período aun pendiente del contrato de arrendamiento. Consideramos este punto en la Parte II. Véase el escolio 18.

entre expropiar parte de un* arrendamiento y expropiar todo el arrendamiento. Esa diferencia consiste en que el arrendatario debe regresar a la propiedad cuando el gobierno termine de usarla, o por lo menos la responsabilidad por el término del arrendamiento que no se expropia descansa sobre el arrendatario. Esto se suscitó en la decisión del caso de *General Motors*. Por razón de tal obligación continua en todas las expropiaciones *parciales* de arrendamientos, el valor de los derechos del arrendatario que son expropiados puede ser afectado por evidencia del costo de una mudanza provisional." *United States* v. *Petty Motor Co.*, supra, págs. 379 y 380. (Bastardillas nuestras.) [20]

Al rechazar costos de mudanza y pérdida de ganancias como daños compensables cuando se expropia todo el término pendiente del arrendamiento, la corte dijo en el caso de *Petty Motor* a las págs. 377 a 379:

"Ni la Constitución ni los estatutos definen el significado de justa compensación. Pero se ha reconocido que justa compensación es el valor del interés que se expropia. Esto no es el valor al dueño por sus propósitos particulares o al expropiante por algún uso especial, sino un llamado 'valor en el mercado'. Se reconoce que un dueño a menudo recibe menos que el valor que la propiedad tiene para él, pero la experiencia ha demostrado que la regla es razonablemente satisfactoria. Toda vez que el 'valor en el mercado' no fluctúa con las necesidades del expropiante o del expropiado, sino con la demanda general para la propiedad, evidencia de pérdidas de ganancias, daños a la plusvalía, gastos de mudanza y reinstalación, y tales otras pérdidas consecuentes son rechazadas en acciones federales de expropiación. *Mitchell* v. *United States*, 267 U. S. 341, 344; *United States ex rel. T. V. A.* v. *Powelson*, 319 U.S. 266, 281; *Potomac Electric Power Co.* v. *United States*, 66 App. D. C.

[20] Aun cuando se tomen en consideración partidas tales como gasto de mudanza, porque sólo se expropie parte del término aun pendiente del arrendamiento, las mismas no se conceden como partidas independientes sino únicamente como elementos a ser considerados para determinar el valor en el mercado del contrato por el período que el gobierno expropia. *United States* v. *General Motors Corp.*, supra, pág. 383; *United States* v. *Westinghouse*, supra, págs. 263 y 264.

77, 85 F.2d 243; Orgel, *Valuation under Eminent Domain,* cap. V. A los fines de estos casos, es inmaterial si el gobierno de hecho expropió los intereses de los arrendatarios en adición al uso provisional de la propiedad o solamente destruyó el derecho de ocupación del arrendatario. Si se expropia alguna propiedad, procede la compensación. *Cf. United States* v. *Welch,* 217 U.S. 333.

"Hubo una expropiación completa de todo el interés de los arrendatarios en la propiedad. Se ha insistido en que medir la justa compensación por la expropiación de un arrendamiento por su valor en el mercado o por la diferencia entre un canon razonable a la fecha de la expropiación y el canon convenido, es injusto. Se ha dicho que la injusticia emana del hecho de que en realidad no hay mercado para arrendamientos; que su valor es algo peculiarmente personal para el arrendatario. Lo mismo es cierto en cuanto a daños incidentales y consecuentes para el dueño de la propiedad. Creemos que la regla más sabia bajo los estatutos federales es tratar la expropiación de todos los intereses en un arrendamiento igual que la expropiación de todos los intereses en una propiedad. En ninguno de estos dos casos debe admitirse evidencia en cuanto al costo de mudanza o reinstalación. Tales costos son aparte del valor de la cosa expropiada. Son costos personales del arrendatario. *El arrendatario tendría que mudarse a la terminación del término de su arrendamiento a menos que el contrato sea renovado.* [21] La compensación por el valor de su arrendamiento cubre la pérdida resultante de la terminación prematura con excepción de la situación poco usual cuando al presente existe un costo mayor de reinstalación que en una fecha futura." (Bastardillas nuestras.) [22]

La disposición en nuestra Carta Orgánica de compensación por propiedad "tomada" o "perjudicada" por el Gobierno de Puerto Rico es más amplia que los términos de la En-

---

[21] El tribunal sentenciador, al negarse a conceder gastos de mudanza al arrendatario en este caso, dijo que tales gastos ". . . son los mismos que normal e indefectiblemente hubiera tenido que sufrir al vencimiento de su contrato."

[22] Al mismo efecto, 18 U. Chi. L. Rev. 349, 352; 4 Nichols, supra, pág. 272; McCormick, supra, 476 a 478; *Minsk* v. *Fulton County,* 64 S.E.2d 336 (Ga., 1951); *United States* v. *40,379 Square Feet of Land, etc.,* 58 F. Supp. 246 (Dist. Ct., Mass., 1944); *Mayor, etc., of Baltimore* v. *Gamse & Bro.,* supra.

mienda V de la Constitución de los Estados Unidos. Véase la Parte I. Pero aun bajo nuestro requisito constitucional debe haber un daño al terreno propiamente dicho o a los derechos de propiedad sobre el mismo; interrupción del negocio operado sobre el terreno, pérdida de negocios durante la mudanza, gastos de mudanza, y costo de reinstalación del equipo no son compensables. *Pueblo* v. *Soc. Agríc. Mario Mercado e Hijos*, supra, pág. 800; *Springfield Southwestern Ry. Co.* v. *Schweitzer*, 158 S.W. 1058 (Mo., 1913) ; 2 Nichols, supra, págs. 348 y 349, citando el caso de *Louisiana Highway Commission* v. *Boudreaux*, 139 So. 521 (La., 1932) ; Anotación, 3 A.L.R.2d 286, 312, 318 y 319; *Developments in the Law—Damages*, 61 Harv. L. Rev. 113, 178; *United States* v. *General Motors Corp.*, supra. En el último caso la Corte Suprema dijo claramente que de ordinario donde, como en este caso, el título de dominio es expropiado, partidas tales como gastos de mudanza, costos de reinstalación del equipo, y pérdida de negocios no son compensables aun bajo un mandato constitucional como el nuestro que exige compensación por propiedad "tomada" o "perjudicada".(23) Por los motivos expuestos en la Parte I, no procede la compensación bajo nuestro Código Civil y nuestra Ley de Expropiación Forzosa por costos de mudanza y pérdida de negocios. Si bien concedimos gastos de mudanza bajo las circunstancias envueltas en *Pueblo* v. *Soc. Agríc. Mario Mercado e Hijos*, supra, dicho

---

(23) En el caso de la *General Motors Corp.* la corte dijo a las págs. 379 y 380: "El soberano de ordinario expropia el título de dominio. La regla en tal caso es que la compensación por dicho interés no incluye futuras pérdidas de ganancias, los gastos de mudar del lugar equipo removible y bienes muebles, la pérdida de la plusvalía que es inherente a la localización del terreno, o cualesquiera otras pérdidas consecuentes similares que sobrevendrían a la venta de la propiedad a cualquier otra persona que no sea el soberano. No hay duda de que todos estos elementos serían considerados por un dueño al determinar si vende y a qué precio. No hay duda, por tanto, de que si el dueño ha de ser compensado por la pérdida consecuente al expropiársele sus bienes por el soberano, estos elementos deben ser considerados debidamente. Pero los tribunales han resuelto generalmente que los mismos no deben ser considerados como parte de la compensación por el título de dominio que el gobierno expropia. No debe entenderse como que nos desviamos de la regla que los tribunales han establecido, la cual

caso es distinguible.([24]) Resolver lo contrario equivaldría a exigir compensación para toda persona que ocupe bienes expropiados—ya sea el dueño del título de dominio o un arrendatario de los bienes—por sus gastos generales de mudanza. Nuestro requisito constitucional de compensación por propiedad tomada o perjudicada—si bien es más amplio que la disposición federal que se limita a compensación por propiedad tomada—no incluye tales gastos.

## IV

■■■ En su apelación Torres señala como único error el pronunciamiento del tribunal sentenciador al efecto de que el arrendamiento terminó el 19 de abril de 1950 a virtud de la expropiación. El Pueblo expropió los terrenos y el edificio en que radicaba la fábrica de alfombras pero no expropió la casa y solar contiguos que también estaban cubiertos por el contrato de arrendamiento. Torres arguye que después de la expropiación, la Floor Coverings siguió siendo responsable por todo el canon—o por lo menos por la parte proporcional correspondiente a la casa—por el período restante del contrato.

creemos correcta. *Aun cuando las constituciones estatales ordenan que se conceda compensación por propiedad 'tomada o perjudicada' para uso público, como muchas lo hacen, se ha resuelto generalmente que lo que se toma o perjudica es el grupo de derechos que el llamado dueño ejercita en su dominio de la cosa física, y que el perjuicio a estos derechos de dominio no incluye pérdidas a su negocio u otros daños consecuentes.*" (Bastardillas nuestras.) En apoyo de este criterio la corte cita Orgel, supra, 1ra. ed., Cap. V, pág. 253.

([24]) En el caso de *Mario Mercado* dijimos que (pág. 799) ". . . *cuando la mejora está adherida al inmueble expropiado* debe concederse indemnización por el costo de su remoción, bajo la teoría de una expropiación parcial." (Bastardillas nuestras.) En dicho caso resolvimos que cierta maquinaria formaba parte del terreno porque (pág. 800) ". . . no podía removerse la maquinaria del edificio expropiado sin que éste fuera demolido . . .". En su alegato ante este Tribunal la Floor Coverings no alega que tiene derecho a gastos de mudanza porque su maquinaria estuviera adherida al terreno. Esta parte del caso de *Mario Mercado* no es por consiguiente aplicable a éste. *Cf. United States* v. *Becktold Co.*, 129 F.2d 473 (C.A. 8, 1942); *Potomac Electric Power Co.* v. *United States*, 85 F.2d 243 (C.A., D.C., 1936); *In re Gratiot Ave., City of Detroit*, 293 N.W. 755 (Mich., 1940); Anotaciones, 156 A.L.R. 397, 34 A.L.R. 1523.

Es innecesario que determinemos si resolveríamos que todo el canon—o solamente la parte proporcional del mismo— debe pagarse cuando permanece vigente un arrendamiento luego de haberse expropiado el título de dominio del terreno. *Cf.* Anotaciones, 163 A.L.R. 679, 43 A.L.R. 1176; Nota, *Lease Frustration by Eminent Domain*, 40 Ill. L. Rev. 558; Mc-Cormick, supra, 473, escolio 36; *John Hancock Mut. Life Ins. Co. v. United States*, 155 F.2d 977 (C.A. 1, 1946), cert. denegado, 329 U.S. 774. Dejamos esta cuestión pendiente ya que convenimos con el tribunal sentenciador en que en este caso el arrendamiento no continuó en vigor bajo nuestro Código Civil luego de haberse expropiado el edificio principal y los terrenos en que éste enclavaba. Cuando mediante expropiación se destruye el propósito para el cual se otorga un arrendamiento, el contrato se da por terminado y el arrendatario no responde al arrendador por los cánones. Art. 1458, Código Civil, ed. de 1930, 31 L.P.R.A. sec. 4065. Véanse Nota, supra, 40 Ill. L. Rev. 558, 559 a 561, y casos citados; 31 Calif. L. Rev. 338 y 445; Anotación, 3 A.L.R.2d 286, 298. El arrendamiento entre Torres y la Floor Coverings demuestra de su faz que su fin principal, si no el único, era la explotación de una fábrica de alfombras en el establo que iba a ser reconstruído por la Floor Coverings. La pequeña vivienda que allí había era meramente incidental a dicho propósito. Por tanto el contrato de arrendamiento se frustró por la actuación del gobierno al expropiar el edificio principal y los terrenos en que éste enclavaba. De esto surge que la Floor Coverings no podía serle responsable a Torres bajo el contrato bien por todos los cánones o bien por alguna parte proporcional de los mismos. (25)

■ La cuestión restante surge del hecho de que Torres cobró "cánones" a razón de $200 al mes a la Floor Coverings durante abril, mayo y junio de 1950, no empece el hecho de

(25) Dejamos pendiente la cuestión de la responsabilidad del arrendatario por los cánones—o una parte proporcional de los mismos—cuando, contrario a los hechos de este caso, la expropiación de parte de los bienes arrendados no frustra el objeto primordial del arrendamiento.

que el edificio de la fábrica y los terrenos en que éste enclavaba pertenecían al Pueblo desde el 19 de abril de 1950. Torres admite que el gobierno tiene derecho a la mayor parte de este dinero por el uso de su propiedad. *Pueblo* v. *Soc. Agríc. Mario Mercado e Hijos,* supra; *López* v. *Tribunal de Distrito,* 67 D.P.R. 176, 179 y 180. Sin embargo, toda vez que la casa continuó siendo de Torres, éste tiene derecho a una suma razonable—que fijamos en $35 mensuales—por su uso por la Floor Coverings durante dicho período.[26] De conformidad, modificaremos la sentencia a fin de ordenarse a Torres que pague al Pueblo la suma de $385 por "cánones" pagados a Torres por la Floor Coverings durante el período en que una suma razonable por el uso de la propiedad debió haberse pagado al gobierno.[27] Torres a su vez tiene derecho a retener la porción restante de los "cánones" pagádosle por la Floor Coverings durante parte del mes de abril, mayo y junio de 1950, por el uso de la casa a razón de $35 mensuales.

*La sentencia del anterior Tribunal de Expropiaciones será modificada (1) eliminándole la disposición de que El Pueblo pagará a la Floor Coverings la suma de $4,000 por la pérdida de su arrendamiento, (2) requiriendo a Torres que pague a la Floor Coverings $626.49 por la pérdida del referido arrendamiento, y (3) ordenando a Torres que pague al Pue-*

---

[26] La prueba fué contradictoria sobre esta partida. Los estimados oscilaron de $15 a $50 por mes. El tribunal sentenciador no resolvió este conflicto. De ordinario devolveríamos este caso al tribunal sentenciador para que llegue a una conclusión de hecho sobre este punto. *Pueblo* v. *Soc. Agríc. Mario Mercado e Hijos,* supra, pág. 808. Pero en vista de la conveniencia de terminar este prolongado pleito, hemos apreciado la evidencia sobre esta cuestión y fijado el valor proporcional de la casa durante el período envuelto en $35 mensuales.

[27] El gobierno tiene derecho a la suma de $165 mensuales—cantidad que hemos asignado al edificio y solar expropiados, véase el escolio 26—por los 2⅓ meses transcurridos desde el 19 de abril al 30 de junio de 1950, o sean $385. Notamos que el gobierno no hace reclamación alguna a la Floor Coverings por el uso de los bienes desde el 30 de junio de 1950 hasta la terminación de la primera semana de agosto de 1950, fecha en que la Floor Coverings terminó sus trabajos en la fábrica de alfombras.

*blo la suma de $385 de los "cánones" cobrados por Torres a la Floor Coverings luego de haber sido El Pueblo investido con el título de los bienes.* ([28])

El Juez Asociado Sr. Negrón Fernández no intervino.

---

Opinión disidente del Juez Asociado señor Belaval.

El día 19 de abril de 1950, El Pueblo de Puerto Rico le expropió a don Carlos J. Torres y a su esposa doña Estela Alcaide de Torres, una parcela de terreno sita en el barrio Hoyos Mulas, del término Municipal de Carolina, Puerto Rico, con ciertas edificaciones construídas sobre la misma, depositando en el anterior Tribunal de Expropiaciones de Puerto Rico, las siguientes cantidades: $1,528.52 por el terreno y $17,747.50 por ciertas edificaciones y mejoras construídas sobre dicha parcela de terreno. Parte del terreno expropiado y las edificaciones contenidas en el mismo estaban arrendados a la Sociedad McCormick Alcaide & Co., S. en C., que en realidad de hecho, es una sociedad controlada por los esposos dueños del terreno; tratándose como se trata, de derechos reversibles, estudiaremos la cuestión litigiosa partiendo de la base, que entre la Sociedad McCormick Alcaide & Co., S. en C., y los esposos Torres Alcaide existe identidad de intereses, en todo lo que se refiere a su posible responsabilidad frente a la última arrendataria Floor Coverings Company of Puerto Rico, Inc. La propiedad arrendada a la Sociedad McCormick Alcaide & Co., S. en C., estaba a su vez arrendada por ésta a la Floor Coverings Company of Puerto Rico, Inc., mediante un contrato escrito de arrendamiento no inscrito en el Registro de la Propiedad, que vencería en o alrededor del mes de septiembre de 1951.

No hay duda que los posibles derechos de la última arrendataria en este caso, no fueron incluídos en la valoración realizada por El Pueblo de Puerto Rico para los efectos de fijar

---

([28]) Según se indica en la Parte I, si por cualquier motivo la Floor Coverings no puede recobrar de Torres la suma de $626.49, el Pueblo será responsable de ella a la Floor Coverings.

la compensación que debía depositarse en el tribunal, y por lo tanto, en la cantidad depositada no figuraba el posible valor del arrendamiento de la Floor Coverings Company of Puerto Rico, Inc.

La posición de El Pueblo de Puerto Rico es, que habiéndose depositado el valor fisiocrático de la propiedad, en dicho valor debía entenderse incluído el importe de cualesquiera reclamaciones que pudiera tener la arrendataria contra su arrendadora o contra los dueños del terreno, y por lo tanto, tales reclamaciones debían pagarse del depósito consignado como justa compensación. La posición de los dueños expropiados es, que al recibir la compensación, ellos no recibieron cantidad alguna que pudiera representar el posible valor del último arrendamiento, y en caso de haberlo recibido, y tener obligación de satisfacerlo, dicho contrato de arrendamiento no tenía ningún valor en el mercado. La posición de la arrendataria Floor Coverings Company of Puerto Rico, Inc., es, que alguien tiene que compensarle el valor de su arrendamiento; que si el Pueblo no lo había tomado en consideración al justipreciar el valor de la propiedad expropiada, el Pueblo resultaba obligado a consignar adicionalmente, dentro de la compensación razonable de la propiedad, el valor de dicho último arrendamiento; que si por el contrario, dicho valor había sido incluído en la tasación y estaba incluído en la compensación retirada por los dueños del terreno, dichos dueños tenían que pagarle el valor de dicho arrendamiento. Estamos conformes que la exposición de las respectivas teorías de las partes, no aparecen en el debate escrito del proceso con la claridad con que han debido aparecer, para la mejor dilucidación de la causa. Pero, poco más o menos, la exposición compendiada que hemos hecho en el párrafo anterior, presenta la verdadera posición adoptada por las partes durante el proceso.

El ilustrado Juez sentenciador llegó a la conclusión, que el derecho de arrendamiento de la Floor Coverings Company of Puerto Rico, Inc., era compensable, que no estaba incluído en la valoración de la propiedad que había servido de base al

depósito de la compensación, y dictó sentencia, ordenándole a El Pueblo de Puerto Rico a pagar cierta suma, que representaba *el valor en el mercado* de dicho último arrendamiento. En apelación, El Pueblo de Puerto Rico alega que el anterior Tribunal de Expropiaciones de Puerto Rico cometió error, al concluir, que en la suma depositada por El Pueblo de Puerto Rico como *valor de la propiedad,* no estaban incluídos *los derechos de la segunda arrendataria,* y cometió error al resolver, que El Pueblo de Puerto Rico venía obligado a valorar el derecho de arrendamiento, y pagar por el mismo. Los arrendadores y dueños expropiados apelan de la parte de la sentencia donde se resuelve, que el contrato de arrendamiento suscrito entre la McCormick Alcaide & Cía., S. en C., y la Floor Coverings of Puerto Rico, Inc., terminó en virtud de la expropiación del terreno y edificaciones efectuada el 19 de abril de 1950, no teniendo la arrendadora derecho a cobrar cánones, por aquella parte de la propiedad arrendada que no había sido expropiada. La segunda arrendataria apela de aquella parte de la sentencia que le negó el derecho de recobrar los gastos de remoción de su equipo industrial del local expropiado, las pérdidas sufridas por la suspensión de su tarea industrial durante el tiempo empleado en la remoción de su equipo industrial del local expropiado y la instalación del mismo equipo en un nuevo local, y le negó el derecho de reclamar de los esposos Torres-Alcaide, la parte proporcional del costo de las mejoras hechas por dicha corporación, en el inmueble expropiado.

La ley envuelta en este caso es el Artículo 2 del párrafo noveno de la Ley Orgánica de Puerto Rico del 1917, que dispone: "la propiedad particular no será tomada ni perjudicada para uso público, a no ser mediante el pago de una justa compensación, *fijada en la forma provista por ley";* el art. 282 del Código Civil de Puerto Rico, ed. del 1930, según quedó enmendado por la Ley núm. 300 de 12 de abril de 1946 ((1) pág. 775), que dispone: "nadie podrá ser privado de su

propiedad sino por autoridad competente, por causa justificada de utilidad pública o beneficio social y mediante el pago de una justa compensación *que se fijará en la forma provista por ley*". La ley donde se establece la forma para la fijación de la compensación es la Ley de Expropiación Forzosa del 1903, según quedó enmendada por la Ley de 11 de marzo de 1908, la Ley de 12 de marzo de 1908, la Ley núm. 68 de 3 de septiembre de 1910, la Ley núm. 73 de 20 de julio de 1921, la Ley núm. 50 de 28 de abril de 1930, la Ley núm. 44 de 6 de agosto de 1935, la Ley núm. 2 de 1ro. de abril de 1941, la Ley núm. 19 de 30 de noviembre de 1942, la Ley núm. 216 de 27 de marzo de 1946, la Ley núm. 105 de 7 de mayo de 1948, la Ley núm. 148 de 29 de abril de 1949 y la Ley núm. 286 de 12 de marzo de 1949.

El primer problema con el cual debemos enfrentarnos, es el siguiente: en un caso de expropiación forzosa, ¿son compensables los derechos de un arrendamiento no inscrito? El arrendamiento es uno de los derechos reunidos en torno a un objeto jurídico, que forman en su totalidad, el derecho de propiedad sobre determinada cosa. Tanto en el concepto de nuestro Código Civil, como en el concepto de nuestra Ley de Expropiación Forzosa del 1903, según ha sido subsiguientemente enmendada, se ha establecido que el derecho de propiedad no es un derecho absoluto, unitario, ante el cual tiene que claudicar todos los otros derechos propietarios comprendidos en la facultad de disponer de la cosa, sino una reunión de todos los derechos constituídos en o existentes sobre el objeto jurídico con arreglo a las leyes. El concepto absoluto de propiedad, llámese dominio (*dominium*), o propiedad simplemente, no ha sido favorecido por ninguna escuela de pensamiento jurídico y ha quedado relegado como un medioevalismo propio de la mentalidad feudal. En su "Compendio del Derecho Civil de España", nos dice Marco Tulio, a las págs. 168 y 169 de la edición de Felipe González Rojas, lo siguiente: "de varias maneras se ha definido la propiedad

entre las muchas definiciones que de ella existen, (y) nos limitaremos a dar cuenta de las siguientes: 1.ª del derecho romano: 'derecho constituído en cosa corporal, del cual nace la facultad de usar, de disponer de ella y de vindicarla (*jus utendi, abutendi, et vindicandi*)'; 2.ª de la Ley de Partida: 'señorío es poder que home ha en su casa, de facer de ella, é en ella lo que quisiere, segund Dios é *segund fuero*'; 3.ª del Código Civil: 'la propiedad es el derecho de gozar y disponer de una cosa sin más limitaciones que las que establecen las leyes'; en realidad, y comparando estas definiciones, no hallamos ninguna que aventaje a la del derecho romano: 'derecho de usar, de disponer y de vindicar', dijeron los romanos, expresando con esas palabras la verdadera esencia del derecho de propiedad, que permite al dueño de una cosa hacer de ella lo que quiera, pero no de un modo irracional, no abusando de ella como algunos han traducido la palabra *abutendi*, sino usándola de manera conforme a su naturaleza; hemos dicho derecho de usar *jus utendi* para significar que puede usar de ella, gozarla, aprovecharse de sus frutos, etc., en la forma que tenga por conveniente; *jus abutendi*, para expresar que en el uso de la cosa se puede llegar hasta consumirla, siendo de las que se consumen con el uso; *jus disponendi* o derecho de disponer de la cosa como quiera, ya trasmitiéndola a otro, ya enajenándola, ya gravándola o hipotecándola, etc., y *jus vindicandi*, para indicar que tiene derecho a excluir a cualquiera de la posesión de la cosa, que puede reivindicarla de cualquier poseedor que la tenga en su poder; en las definiciones modernas, no se ha precisado tan bien el concepto de la propiedad como en la citada del derecho romano, porque se ha querido hacer compatibles las facultades inherentes a la propiedad, al dominio, con las limitaciones indispensables para el uso prudente de las cosas; por eso se ha dicho en el Código Civil como se dijo también en el Código de Napoleón, derecho de gozar y disponer de una cosa sin más limitaciones que las que establecen las leyes; es decir,

que no se pierde de vista la idea de la limitación." Sobre lo mismo, véase 3 Manresa 130, (sexta ed. de la Editorial Reus), (1934).

Si se trata de un contrato de arrendamiento inscrito en el Registro de la Propiedad, el derecho propietario asegurado con garantía sobre la cosa, que representa el arrendamiento inscrito, se convierte en una verdadera carga real, que afecta no sólo a la disponibilidad por el dueño, del objeto dado en arrendamiento, sino al cuerpo de bienes, o cosa corporal, sobre el cual está constituído. En este caso, el valor del arrendamiento, capitalizado como cualquier otro derecho real, forma parte del valor de la cosa, lo mismo que una hipoteca, un censo, un derecho real de uso o de habitación.

Si se trata de un contrato de arrendamiento no inscrito, la situación varía. El art. 1461 del Código Civil de Puerto Rico, ed. del 1930, dispone, que "el comprador de una finca arrendada tiene derecho a que termine el arriendo vigente al verificarse la venta, salvo pacto en contrario, y lo dispuesto en la Ley hipotecaria; si el comprador usare de este derecho, el arrendatario podrá exigir que se le deje recoger los frutos de la cosecha que corresponda al año agrícola corriente *y que el vendedor le indemnice los daños y perjuicios que se le causen.*" De todo lo que se deduce, que si la terminación de un contrato de arrendamiento no inscrito, se produce por *un acto voluntario* del anterior dueño, es a dicho anterior dueño a quien le corresponde la indemnización de los daños y perjuicios que se le causen al arrendatario, por tener que desalojar la propiedad arrendada, antes del vencimiento legal de su contrato.

Ahora bien, cuando el objeto o cosa arrendada se expropia para fines de utilidad pública, es indudable que la terminación del contrato de arrendamiento no inscrito, no se debe *a un acto voluntario* del anterior dueño, sino a la actuación de una persona con un derecho social superior al del anterior dueño y al del propio arrendatario. Pero este derecho social

superior no puede ejercitarlo el Estado, sin compensar debidamente a todas las personas que tengan título de propiedad o interés en el objeto o cosa expropiada, y a todas las personas que sufran daños por causa de dicha confiscación. Teóricamente, podría presentarse el problema de la responsabilidad del expropiante bajo dos aspectos: (1) el Estado, al adquirir todos los derechos propietarios del objeto o la cosa expropiada, sustituye al anterior dueño en todas las responsabilidades que éste último tenía frente al arrendatario; (2) el Estado, al ejercer su derecho social superior, se encuentra obligado por la disposición constitucional a compensar, tanto el derecho del dueño de la cosa, como el interés que cualquiera persona tenga sobre la cosa, como los daños que cualquiera persona pueda sufrir en virtud de la adquisición de la posesión de la cosa. Por lo que, bien se trate de un caso de subrogación, o de un caso de extinción de derecho en virtud del previo pago de la correspondiente compensación, el Estado resulta responsable del pago del derecho del dueño como del derecho de aquel que tenga interés sobre la cosa, como del pago del daño causado al arrendatario, cuando el mismo ocupa la propiedad en virtud de un contrato de arrendamiento no inscrito.

El doble aspecto de esta responsabilidad del Estado se comprende mejor, cuando se estudia la concordancia original de nuestra Ley de Expropiación Forzosa del 1903, con el Código Civil de Puerto Rico del 1902. El art. 335 de la edición del año 1902 del Código Civil de Puerto Rico, convertido en el art. 282 de la edición del año 1930, al cual hace referencia la sec. 1 de la Ley de Expropiación Forzosa de 1903, disponía, que "nadie podrá ser privado de su propiedad sino por autoridad competente y por causa justificada de utilidad pública, previa siempre la indemnización correspondiente; si no precediere este requisito, las cortes de distrito ampararán y en su caso reintegrarán en la posesión al expropiado; la indemnización comprenderá no solo *el valor de la cosa* de

la cual el propietario es privado sino que también una remuneración por los daños y perjuicios que se le ocasionen con la privación de la propiedad", como sería la indemnización que el dueño tendría que pagarle al arrendatario por la terminación, antes del vencimiento, de un contrato de arrendamiento no inscrito. Como se ve, en la redacción original del art. 335 del Código Civil de Puerto Rico, que sirve de fuente de inspiración a nuestra Ley de Expropiación Forzosa del 1903, se distinguía claramente entre el valor fisiocrático de la cosa, como cuerpo de bienes, o cosa corporal, y el valor de otros beneficios afectados por la expropiación y de otros perjuicios causados por la misma. Bien es verdad, que cuando se enmienda este artículo por la Ley núm. 300 de 12 de abril de *1946*, sus disposiciones quedaron reducidas a los siguientes términos: "nadie podrá ser privado de su propiedad sino por autoridad competente, por causa justificada de utilidad pública o beneficio social y mediante el pago de una justa compensación que se fijará en la forma provista por ley".

Pero cuando se examina la sec. 4 de la Ley de Expropiación Forzosa de 1903, según quedó enmendada por la Ley núm. 105 de 7 de mayo de 1948, que incluye una ulterior disposición que dice: "la demanda podrá ir dirigida contra los dueños de la propiedad, sus ocupantes y *todas las demás personas* con derecho o *interés* sobre la misma, o podrá ir dirigida contra la propiedad en sí; cuando ocurriere esto último en la demanda se mencionarán hasta donde sea posible al demandante determinarlo, los nombres de todas aquellas personas que como *dueños, ocupantes o poseedores* de cualquier derecho o *interés* sobre la propiedad, deben ser notificados del procedimiento a los fines del derecho que puedan tener a la compensación que se fije por el *valor de la propiedad* expropiada *o a los daños* que el procedimiento ocasione", aparece nuevamente consagrado por la voluntad legislativa, el anterior concepto de *considerar al valor de la cosa*.

expropiada como algo separado e independiente del *valor de otros derechos* establecidos sobre ella, lo cual armoniza con la disposición original de la sec. 5, en aquella parte que se retiene fuera de las enmiendas por inclusión, que sufre dicha sec. 5, que dice: "todas las personas que *ocuparen* cualquiera de las propiedades descritas en la demanda, o que tuvieren o pretendieren tener cualquier interés en la misma, o en los *daños* y *perjuicios* ocasionados por la expropiación,... podrán comparecer y alegar su derecho, cada una por lo que respecta al *dominio* o *interés* que en la propiedad tuviere o reclamare,... de la demanda ."

Conclusión: La Ley de Expropiación Forzosa de 1903 dispone una compensación mucho más amplia que la compensación por el mero valor fisiocrático de la cosa, y por lo tanto, son compensables: (1) el valor de la cosa como cuerpo de bienes y (2) los otros derechos propietarios reunidos en torno a la cosa, como son, el censo, la hipoteca, el uso, la habitación, el arrendamiento. En caso de expropiación de una propiedad arrendada, cuando el arrendamiento está inscrito en el Registro, el mismo constituye una carga real que afecta al valor de la cosa y debe ser capitalizada como formando parte del valor de la cosa; cuando el arrendamiento no está inscrito, lo que procede es la compensación de los daños y perjuicios ocasionados al arrendatario.

Las dos obligaciones principales del Estado puertorriqueño, en un caso de expropiación forzosa de propiedad privada, son (1) el pago de la justa compensación a todos los que tengan un derecho de propiedad sobre la cosa expropiada, o algún interés sobre la misma, o sufran algún daño o perjuicio, o ambos, en virtud de la expropiación, según ya hemos visto y (2) la notificación que exige no sólo el estatuto, sino el debido proceso de ley, para que todas las personas afectadas por la expropiación, comparezcan a defender sus respectivos derechos. Parece que en este caso, se partió del principio que el Estado sólo tenía que compensar al dueño de

la cosa expropiada, o a los dueños de los derechos reales inscritos en el Registro de la Propiedad, y no se notificó a la arrendataria. Hay prueba de que los dueños del terreno y de las edificaciones, le informaron a los oficiales encargados de la expropiación, tanto por escrito como oralmente, de la existencia del arrendamiento. En el caso de *United States* v. *Certain Parcels of Land*, 40 F.Supp. 436, (*Chesnut*), (1941), cita precisa a la pág. 444, se resolvió, que los derechos de partes no mencionadas en el procedimiento o desconocidas, no pueden considerarse adjudicados por el procedimiento, aunque el Estado haya adquirido el título y la posesión de la cosa expropiada y el depósito de la compensación haya sido totalmente distribuído por el Tribunal de Expropiación, porque el principio general del debido proceso de ley, establece que ninguna persona queda obligada por los procedimientos de un tribunal, cuando no ha sido parte de tales procedimientos. En cuanto a la necesidad de notificar a cualquiera persona sobre la disposición de la compensación, aunque no haya comparecido al procedimiento después de citada, véase el caso de *Pueblo* v. *632 Metros Cuadrados de Terreno*, 74 D.P.R. 961, (*Snyder*), (1953), cita precisa a la pág. 982. Véase además: *Musanti* v. *State*, 131 N.Y.S. 20 (*Rodenbeck*), (1911), cita precisa a la pág. 21.

Después de hecho el justiprecio de la propiedad, de los derechos correspondientes a cada persona que tenga interés sobre la propiedad, y de los daños y perjuicios ocasionados a los ocupantes, poseedores, usuarios o arrendatarios, la segunda importante tarea del procedimiento de expropiación es la notificación. En Puerto Rico no debe ser difícil determinar cuáles son los verdaderos dueños de una propiedad, pues existe constancia oficial sobre el estado de los títulos y demás derechos reales en los Registros de la Propiedad. Cuando se trata de propiedades no inscritas, debe atenerse el expropiante, no sólo a la información conseguida a través de precaristas, ocupantes, usuarios o arrendatarios, sino al pro-

cedimiento de citación por edicto de todas las demás personas innominadas o desconocidas, que puedan tener algún interés sobre la cosa expropiada o sufrir algun daño por razón de la expropiación. Como cuestión de ley, la responsabilidad del Estado continúa hasta que todos los derechos de todas las personas con título, participación o interés hayan sido adjudicados dentro del procedimiento de expropiación.

Si bien el Estado, por haberse subrogado en las obligaciones del dueño o del sub-arrendador tiene la obligación de indemnizar al propietario de un contrato de arrendamiento no inscrito, los daños que se hayan podido prever al tiempo de constituirse la obligación, y que sean consecuencia necesaria de su falta de cumplimiento, no tiene la obligación de indemnizar todos los daños y perjuicios que pueda sufrir el arrendatario. Los daños que tiene que indemnizar son los daños y perjuicios comprendidos en el art. 1461 del Código Civil de Puerto Rico. La Sentencia de 3 de noviembre de 1892 del Tribunal Supremo de España, glosada en 10 Manresa 660,—quinta ed. revisada del 1950 del Instituto Editorial Reus—, establece que "los daños y perjuicios de que responde al arrendatario el vendedor de una finca arrendada, son los previstos o que se hayan podido prever al tiempo de constituirse la obligación y que sean consecuencia necesaria de su falta de cumplimiento. Aplícase pues el artículo 1,107 [1060 nuestro] y se considera al vendedor como deudor de buena fe. Se trataba del desahucio de un fotógrafo y se condenó al vendedor a que indemnizase solamente: 1—los gastos de mudanza; 2—el desarme y montaje del local destinado a la industria, 3—el levantamiento y colocación de la instalación del portal para publicidad, 4—el importe del material que quedaba inútil."

Al no definir la Ley de Expropiación Forzosa de 1903, según enmendada, cuáles son los daños que deberán compensarse, debemos aplicar el art. 1461 del Código Civil de Puerto Rico para determinar, en el caso de un arrendamiento no

inscrito, cuáles son los daños realmente compensables. Ya hemos visto que el vendedor de la propiedad arrendada se le considera, salvo prueba en contrario, deudor de buena fe, principio que resulta más que lógico cuando el vendedor subrogado resulta ser el Estado, pues lo acompaña la presunción de que actúa en favor del bien público.

Aplicado este principio a las realidades modernas de las instalaciones fabriles, resultan compensables, (1) los gastos de mudanza desde la planta fabril expropiada hasta la nueva planta fabril arrendada o construída; (2) los gastos de desmontar la maquinaria en la planta fabril expropiada y los gastos de volverla a montar en la nueva planta fabril arrendada o construída; (3) el material industrial que resulte inservible por causa del cambio o mudanza de una planta para otra, cuando se trate de maquinaria o artefactos manufacturados o construídos para ser instalados en un área específica.

Por idéntica razón, no concederemos daños o perjuicios por la interrupción de la tarea industrial, o por la pérdida de algunos anexos hechos para la mejor utilización del local arrendado, o por la pérdida de tiempo o de dinero empleado en la preparación de un nuevo grupo de trabajadores industriales en una zona distinta, pues los daños previstos son los del "desahucio anticipado".

En cuanto a las mejoras realizadas por la arrendataria sobre la planta industrial expropiada, el contrato firmado entre la segunda arrendadora y la segunda arrendataria, aquí interventora, especificaba que las mejoras quedarían a favor de la arrendadora al vencimiento del contrato de arrendamiento. El único efecto de la expropiación fué anticipar un año antes, poco más o menos, el vencimiento legal del arrendamiento. La indemnización sería por la pérdida del uso de las mejoras realizadas en la planta. La prueba demostró que las mejoras se hicieron conjuntamente por la arrendadora y la segunda arrendataria; que eran mejoras permanentes con el fin de convertir un establo en una fábrica industrial;

que la arrendataria gastó $4,176.66 para realizar la parte de las mejoras que le correspondía según contrato. En realidad, este daño no está propiamente comprendido, entre las indemnizaciones concedidas al arrendatario de un contrato de arrendamiento no inscrito, interrumpido por la expropiación. Se trata de un caso curioso, donde la propiedad de la mejora le pertenece a los dueños y el uso a la arrendataria. Podemos, pues, considerar a la arrendataria, además de arrendataria, como una usuaria de la mejora. Como usuaria tendría derecho a una compensación totalmente independiente y distinta de la compensación que le correspondería como arrendataria. El ilustrado Juez sentenciador la consideró como dinero invertido y no gastado, y para compensarla, dividió la cantidad invertida en las mejoras por la arrendataria por el número de meses comprendidos en el término total del contrato. Después de obtener el costo de la mejora por mes, lo multiplicó por el número de meses que faltaban por transcurrir cuando se produjo la expropiación, fórmula que nos parece la más lógica y atinada, dentro de la especialidad del caso, para determinar el posible valor del uso. Notamos sin embargo, un pequeño error en la apreciación del número de meses que faltaban por transcurrir. Como admitió el propio administrador de la fábrica, señor Molina, (t.56), la fábrica estuvo funcionando hasta la primera semana de julio de 1950. El contrato vencía el 31 de julio de 1951, o sea trece meses en total. El dinero gastado por la arrendataria en las mejoras fué $4,176.66; dividido por sesenta meses, que es el término total en meses del contrato, hace una inversión mensual adicional a la renta de $69.61; multiplicado por los trece meses que faltaban para vencerse el contrato, dan $904.94. Como la interrupción en *el uso de la propiedad mejorada* es causada por la expropiación, es justo que sea el Estado y no la arrendadora, quien lo compense.

Otro asunto marginal al problema del justiprecio, es la alegación de los dueños o arrendadores al efecto, que no ha-

biendo sido la expropiación total, sino que dejara sin expropiar una casa de vivienda que ocupaban los directores o empleados de la arrendataria para vivienda, el contrato de arrendamiento quedaba en vigor en cuanto a dicha vivienda, debiendo la arrendataria sufragar a los dueños expropiados o a la sociedad arrendadora la renta proporcional que representara dicha vivienda. La arrendataria, por el contrario alega, que el contrato de arrendamiento quedó forzosamente resuelto en su totalidad, ya que dicha casa, aislada de la planta fabril, no tenía ninguna utilidad para ella. Aunque nos hemos negado a compensar cualesquiera perjuicios en casos de arrendamientos no inscritos, que no sean los anticipados al momento de firmarse el contrato, no podemos abstraernos a la realidad que se trata de otra cuestión litigiosa marginal, sometida dentro del procedimiento, por haber el ilustrado Juez sentenciador admitido prueba sobre este extremo, haber pasado dictamen sobre ella y haberse señalado por los dueños y la arrendadora como error en apelación. Además si consideráramos que los dueños o arrendadores tienen derecho a percibir esa renta, es indudable que tendríamos que pasar a considerar los perjuicios que por agravación le corresponderían a la arrendataria, como un daño independiente al desahucio anticipado. Veamos, si en realidad de derecho, los dueños o arrendadores tienen razón.

El art. 1458 de la ed. del 1930 del Código Civil de Puerto Rico, equivalente al art. 1568 del Código Civil de España, dispone que: "si se pierde la cosa arrendada o alguno de los contratantes falta al cumplimiento de lo estipulado, se observará respectivamente lo dispuesto en los artículos 1136 y 1137 y en los 1054 y 1077." De estos cuatro artículos, el verdaderamente importante para la situación que nos ocupa es el art. 1077, que es el que dispone, que "la facultad de resolver las obligaciones se entiende implícita en las recíprocas, para el caso de que uno de los obligados no cumpliere lo que le incumbe; el perjudicado podrá escoger entre exigir el

cumplimiento o la resolución de la obligación, con el resarcimiento de daños y abono de interés en ambos casos".... En realidad de derecho, lo que produce la expropiación forzosa es un caso de incumplimiento forzoso de todas las obligaciones que afecten a la cosa expropiada. En casos de arrendamientos establecidos sobre la cosa expropiada, cuando el arrendador tiene que faltar forzosamente al cumplimiento de lo estipulado, y *se pierde o destruye parcialmente* la cosa arrendada, lo que hay que determinar es si ha ocurrido "aquel esencial cambio de estado que la haga inapta para el fin a que venía siendo destinada" 10 Manresa 632 (ed. citada). En este caso, el principal cuerpo de bienes era la fábrica. La vivienda era utilizada por algunos directores o empleados de la fábrica para vivir cerca de la planta fabril. Destruída la fábrica, la vivienda sufre aquel cambio esencial de estado que la hace inapta para el fin a que venía siendo destinada. Siendo esto así, la arrendataria tenía la facultad de resolver la totalidad del arrendamiento, tanto por el incumplimiento forzoso que se produce, como por el cambio que sufre la cosa arrendada, y los dueños-arrendadores no tienen derecho a seguir percibiendo renta alguna por el uso de dicha casa y de los terrenos cubiertos por la estructura, siendo obligación de dichos dueños-arrendadores devolver al Estado las rentas que hayan recibido, desde el momento mismo en que se expidió por el tribunal la orden de entrega de la propiedad, sujeta al procedimiento de expropiación.

Debe pues, modificarse la sentencia, concediendo a la arrendataria interventora Floor Coverings Company of Puerto Rico, las siguientes cantidades:

1. Por el uso interrumpido de las mejoras
 realizadas por ella ................ $904.94

2. Por mano de obra de la mudanza, 500 horas
 a treinta y cinco centavos la hora (t.68) 175.00

| | |
|---|---:|
| 3. Veintidós viajes de 12 millas o sea 264 millas a 15 centavos y $40 por concepto de salario al chófer (t. 69 y 70) .......... | 79. 60 |
| 4. Alquiler de un "lift truck" por 5 días a $20 diarios (t.70) .................. | 100. 00 |
| 5. Alquiler de maquinaria larga "winches" "blockings", (t.70) ................. | 100. 00 |
| 6. Supervisión de la obra dos semanas (t.70) | 300. 00 |
| 7. Pérdida de un marco por espacio inadecuado en el nuevo local.............. | 2, 000. 00 |

las cuales debe satisfacer El Pueblo de Puerto Rico, con intereses legales desde el 1ro. de julio de 1950.

La opinión de la mayoría, para un resultado distinto, contiene una serie de afirmaciones con las cuales no puedo estar conforme. Asumiendo, aunque sin resolverlo, que nuestro procedimiento de expropiación forzosa fuera siempre un procedimiento *in rem,* lo único que esto significa es, que las reclamaciones de las personas con algún derecho o interés sobre la propiedad, en vez de dirigirse contra la propiedad deben dirigirse contra el depósito monetario que la sustituye. Este aspecto puramente procesal de la expropiación, no afecta la declaración de derechos sobre la compensación, (*rights against the fund*) : *United States* v. *Petty Motor Co.,* 327 U.S. 372, 90 L. Ed. 729, (*Reed*), (1946), cita precisa a la pág. 376 U.S., 734 L. Ed.

Tampoco veo cómo pueda afectar el derecho a la compensación la clase de título que adquiera el Estado. La afirmación que contiene la opinión de la mayoría, en el sentido, que lo que expropia el Estado es el título absoluto de dominio de los bienes expropiados y no los diversos intereses de los demandados en particular, parece llevar implícita, en sí misma la afirmación, que en dicho "título absoluto de dominio" no están incluídos ninguno de los derechos o intereses que poseyeran los usuarios, arrendatarios, usufructuarios, censualistas, acreedores hipotecarios o cualesquiera otras personas

con derechos reales o contractuales sobre la cosa expropiada. La afirmación me parece tan seria que he decidido ampliar mi análisis anterior sobre lo que constituye el derecho de propiedad, para fijar precisamente el significado que debemos darle a este concepto: "título absoluto de dominio."

La Ley de Expropiación Forzosa de Puerto Rico sólo ha tenido dos fuentes de inspiración: la Ley de Expropiación Forzosa de 10 de enero de 1879 de España, coordinada en cuanto a su terminología y definición de derechos, con el Derecho civil español y la Ley Pública 736 de 26 de febrero de 1931 del Congreso de Estados Unidos, más bien relacionada en cuanto a un solo aspecto de nuestro procedimiento de expropiación: la orden de adquisición y entrega, coordinada en cuanto a su terminología y definición de derechos con la jurisprudencia federal. De la coordinación de principios entre nuestra propia Ley de Expropiación Forzosa y nuestro Código Civil no puede existir duda alguna. Nuestra Ley de Expropiación Forzosa no pretende definir ninguno de los derechos a que se refiere, y por el contrario, los usa en la acepción genérica que los mismos tienen en nuestro Código civil.

Nuestra Ley de Expropiación Forzosa no define lo que deberá entenderse por "título absoluto de dominio". En la legislación española y en la legislación puertorriqueña, contemporáneas con las leyes de expropiación forzosa española y puertorriqueña, no existe el concepto de título absoluto de dominio *mancipium*, (botín de guerra), *dominium*, (derecho quiritario), (señorío), tal como hubiera podido entenderse en tiempo de la monarquía goda o la dominación árabe, verdadero período feudal del Derecho español. Con toda seguridad se puede afirmar que desde el 1811, en la legislación civil española, de la cual se origina la nuestra, los señoríos territoriales y solariegos quedaron reducidos a meros derechos de propiedad individual. Lo mismo se puede afirmar de los mayorazgos, abolidos desde el 1820. Cuando en nues-

tro Código civil se habla del dominio se consagra su divisibilidad de acuerdo con la transformación de la antigua servidumbre solariega: dominio directo, dominio útil, o se le considera como uno, entre otros, de los derechos reales: (art. 545 del Código Civil de Puerto Rico, ed. 1930). En el actual Código Civil español y en el actual Código Civil puertorriqueño lo que se reconoce es el derecho de propiedad, (proprietas), según ya hemos dicho, considerado como una reunión de derechos propietarios en torno a la cosa, objeto del contrato: III—I Puig Peña—Tratado de Derecho Civil Español 66. (ed. de la Revista de Derecho Privado). Por eso al referirnos anteriormente al derecho de propiedad, consagramos su divisibilidad entre los derechos de usar, abusar, disponer y vindicar la cosa, siguiendo la glosa de Marco Tulio.

La jurisprudencia federal hace tiempo descartó la teoría de esa especie de mayorazgo agnaticio inglés, de origen románico *feudum talliatum (fee tail)*, por la teoría del *fee simple*, reunión de derechos inherentes a la cosa. En el caso de *United States* v. *General Motors Corp.*, 323 U.S. 373, 89 L. Ed. 311, (*Roberts*), (1945), cita precisa a las págs. 377–378 U.S., 318 L. Ed., se fijó el concepto del *fee simple* de la siguiente forma: "la corrección de lo resuelto por la corte inferior depende del alcance (*scope*) y sentido (*meaning*) de la disposición constitucional que establece: 'ni podrá tomarse propiedad privada para uso público sin la debida compensación'. Los conceptos cardinales (*critical terms*) son 'propiedad', 'adquisición y justa compensación'. Se puede concebir que el primero de ellos, fué usado en su acepción vulgar y no técnica, como la cosa física (*physical thing*), con relación a la cual, el ciudadano ejercita los derechos que le reconoce la ley. Por el contrario, ha podido ser empleado en un sentido más preciso (*accurate*) para denotar *el grupo de derechos inherentes a la relación que guarda el ciudadano con la cosa física, tal como el derecho a poseer* (possess), *usar* (use), *y disponer* (dispose), *de la cosa*. Como cuestión de

hecho, la interpretación que se le ha dado, es esta última: Cuando el Soberano ejercita su derecho de dominio eminente ocupa, en relación con la cosa física en cuestión, el lugar de aquél que antes mantuvo tal relación con la cosa, *relación que hemos denominado como propiedad* (ownership). Dicho de otro modo, el Soberano tiene que bregar (*deals*) con algo que los abogados llamarían 'interés' individual sobre la cosa en cuestión. Dicho interés puede comprender, *desde el grupo de derechos* (group of rights) *que como un signo taquigráfico* (shorthand term) *se conoce como 'fee simple'*, hasta algún interés reconocible en una herencia (*estate*) o un derecho de arrendamiento a plazo fijo (*tenancy for years*), como en el presente caso." En dicho caso se resuelve además, que la salvedad constitucional de la debida compensación está dirigida (is addressed) *a cualquiera clase de interés* (to every sort of interest) que el ciudadano posea sobre la cosa, objeto de la expropiación: (cita precisa a la pág. 378 U.S., 318 L. Ed.).

Bien se considere el concepto "título absoluto de dominio", como una reunión de derechos propietarios en torno a la cosa, según la teoría del Derecho civil o como un grupo de derechos inherentes a la relación que guarda el ciudadano con la cosa física, resulta claro que el título absoluto de dominio, (*fee simple*) no es un derecho integrado en sí mismo, capaz de inmovilizar a los otros derechos propietarios, siguiendo su concepción medioeval, sino todos los derechos propietarios sobre la cosa, objeto del contrato. La importancia de fijar clara y precisamente, tanto el alcance como el sentido de dicho concepto, en cuestiones de expropiación, estriba en que está íntimamente relacionado con la distribución de la debida compensación. La divisibilidad del título, trae la divisibilidad del derecho o interés, y por tanto, la divisibilidad de la compensación.

Ahora bien, fundamentalmente, las leyes de expropiación son leyes procesales. La naturaleza, definición y alcance de

los derechos reconocidos por ellas, no están dispuestos en dichas leyes. Por tanto, hay que buscar dicha naturaleza, definición y alcance en las leyes sustantivas, que son las que ordinariamente disponen todo lo referente a dichos derechos.

El art. 1461 del Código Civil de Puerto Rico (1930) dispone expresamente que "el comprador de una finca arrendada tiene derecho a que termine el arriendo vigente al verificarse la venta, salvo pacto en contrario, y lo dispuesto en la ley hipotecaria. Si el comprador usare de este derecho, el arrendatario podrá exigir que se le deje recoger los frutos de la cosecha que corresponda al año agrícola corriente y que el vendedor le indemnice los daños y perjuicios que se le causen." Tal como está redactado este artículo, a primera vista, parece que se aplica a arrendamientos rústicos exclusivamente. Pero no es así. El artículo se aplica lo mismo a arrendamientos rústicos que a arrendamientos urbanos: Sentencia del Tribunal Supremo de España de 27 de septiembre de 1905.

Como se ve, el derecho que le reconoce el Código Civil de Puerto Rico a un arrendatario por término fijo, cuyo contrato no conste inscrito en el Registro de la Propiedad, cuando el dueño de la propiedad arrendada la vende, es una indemnización por los daños y perjuicios que se le causen, que debe satisfacer el vendedor, anterior arrendador. En caso de expropiación, como se trata de una venta forzosa, el Estado "sustituye al arrendador para el pago de las indemnizaciones que éste pudiera estar obligado a hacer en razón del cumplimiento del arrendamiento": 10 Planiol Ripert Derecho Civil Francés 836 final de página y 837 principio de página. Que se trate de una indemnización por daños no presenta problema alguno ya que tanto nuestras anteriores Cartas Orgánicas, como nuestra actual Constitución, conceden debida compensación tanto por el valor de la cosa en sí, como por los daños que causa la expropiación: *Pueblo* v. *García*, 66 D.P.R. 504, (*De Jesús*), (1946), cita precisa a la pág.

511; *Pueblo* v. *Sociedad Agrícola Mario Mercado e Hijos*, 72 D.P.R. 792 (*Todd, hijo*), (1951), cita precisa a la pág. 799.

Haciendo total abstracción de nuestra ley local, la opinión de la mayoría ha decidido que cuando se trate de la expropiación de una finca arrendada por un término fijo, sin un arrendamiento inscrito, la compensación del arrendatario debe calcularse a base del valor en el mercado de dicho arrendamiento y no a base de los daños sufridos. Las autoridades citadas son las características de aquellos casos, donde el derecho a indemnización por daños del arrendatario por una venta forzosa de la propiedad arrendada, no estaba regulada por la ley local, como es el caso de Puerto Rico. Algunos de ellos tratan de contratos de arrendamientos que tenían cláusulas automáticas de vencimiento por razón de expropiación. De manera que no se trata de jurisprudencia de aplicación estricta, que nos obligara a razonar en otra forma, la interpretación literal de nuestra propia ley. La valoración de contratos de arrendamientos no inscritos de acuerdo con el precio en el mercado, resultará una carga más onerosa para el Estado que la carga que tendría que sufrir un individuo por violación de un contrato privado de arrendamiento no inscrito.

Por las razones expuestas me veo obligado a disentir.